UNITED STATES *v.* SCOTT.

Upon a comparison of the 25th section of the act of 3d March, 1863, passed during the rebellion, "for enrolling and *calling out* the national forces, and for other purposes," with the 12th section of the act of 24th February, 1864, enacting that any person who shall forcibly resist or oppose any *enrolment* of persons for military service, &c., shall be punished, &c.; *held*, that the former act is limited to the prevention of resistance to the *draft*, and the latter to preventing resistance to the *enrolment*. Comparing the two acts together, the latter one is to be regarded as a legislative construction of the first, by which a service in relation to the draft, is not a service in relation to the enrolment.

On the 3d March, 1863, Congress, with a view to enable the government to put down the rebellion, which was then exerting itself to destroy the nation, passed "An act for enrolling and *calling out* the national forces, and for other purposes."* This act creates boards of enrolment, and prescribes their duties.

By one section, each board was to be composed of the provost marshal of the district as president, and two other persons, to be appointed by the president, one of whom was to be a licensed and practising physician and surgeon.

By another, the board was to appoint enrolling officers, whose duty it should be to enrol all persons of their districts subject to military duty, noting their age and places of residence, and to report all to the board of enrolment, who were to consolidate the names "into one *list*."

By another section it was enacted, that whenever it might be necessary to call out the national forces for military services, *the President* might assign to each district the number

---

* 12 Stat. at Large, 731.

of men to be furnished by it; and thereupon the enrolling board, " under the direction of *the President*," had power to make a draft of the required number, and a complete roll of the names of the persons so drawn, and the persons so drawn were to receive notice of the fact, requiring them to appear at a designated rendezvous to report for duty.

Another section required, that all persons who had been drafted and received notice should, on arriving at the rendezvous, be inspected by the surgeon of the board, who was to report to the board the physical condition of each one; and that all persons drafted and claiming exemption from military duty, on account of disability or any other cause, should present their names to the board, whose decision as to their right of exemption should be final.

The 16th section authorized the board to discharge any excess of numbers; and provided that the expenses connected with the enrolment and draft, including subsistence while at the rendezvous, should be paid from the appropriation for enrolment and drafting, under such regulations as the President of the United States should prescribe.

By the 25th section of this act it was enacted,

" That if any person shall resist any *draft* of men enrolled under this act into the service of the United States, or shall counsel or aid any person to resist any such *draft;* or shall assault or obstruct any officer in making such *draft*, or in the performance *of any service in relation thereto;* or shall counsel any person to assault or obstruct any such officer; or shall counsel any drafted men not to appear at the place of rendezvous, or wilfully dissuade them from the performance of military duty as required by law, such person shall be subject to summary arrest by the provost marshal, and shall be forthwith delivered to the civil authorities, and, upon conviction thereof, be punished by a fine not exceeding $500, or by imprisonment, not exceeding two years, or by both of said punishments."

On the 24th February, 1864, Congress passed an act "to amend" the former one.*  This amendatory act recognizes

---

* 13 Stat. at Large, 8.

the old " boards of enrolment;" declaring that they "shall *enrol* all persons liable to *draft;*" and section three of the act declares that if the quotas are not made up within a time fixed by the President, the *provost marshal* of the district shall, under the direction of the provost marshal general, " make a draft for the number deficient."

The 12th section of this amendatory act reads as follows:

" That any person who shall forcibly resist or oppose any *enrolment*, or shall incite, counsel, encourage, or who shall conspire or confederate with any other person or persons, forcibly to resist or oppose any such *enrolment;* or who shall aid or assist, or take any part in any forcible resistance or opposition thereto; or who shall assault, obstruct, impede, or threaten any officer or other person employed in making or aiding to make any such *enrolment*, or employed in the performance, or aiding in the performance, of any service in any way relating thereto, &c., shall, upon conviction, be punished by fine not exceeding $5000; or by imprisonment not exceeding five years; or both of said punishments, in the discretion of the court. And in cases where *such* assaulting shall produce the death of such officer or other person, the offender shall be deemed guilty of *murder*, and upon conviction, &c., be punished with death, &c. And nothing in this section shall be construed to relieve the party offending from liability, under proper indictment or process, for any crime against the *laws of a State.*"

The amendatory act repeals so much of the former act as may be inconsistent with it.

In this state of the statutes, Scott was indicted, in the Circuit Court for Indiana, under the above quoted 12th section of the amendatory act of 1864, for the murder of Eli McCarty. The indictment charged that McCarty was murdered while in " the performance of his legal service in relation to the *enrolment* of the national forces;" but in stating more particularly what that service was, it was alleged to be the " *serving with notice the enrolled and drafted men*, requiring them, as such enrolled and drafted men, to appear, &c., and report for military duty."

Scott was tried and found guilty. But on a motion in

arrest of judgment, the judges of that court were divided in opinion upon the question, whether the services of McCarty, in notifying to " enrolled and drafted men" to appear at the designated rendezvous " and report for military duty," considered in connection with the other averments in the indictment, constituted any employment in the performance, or in aiding in the performance, of any service in any way relating to the *enrolment* mentioned in the said 12th section?

The ground of the query doubtless was—as McCarty was engaged in notifying to *enrolled* and *drafted* men to appear at the place of rendezvous—that this presupposed not only a completed enrolment, but a draft in pursuance of it; and the work in which he was engaged had direct relation to the draft, and necessarily followed it. Could the court, then, pass over the important act of the draft, from which the duties of McCarty directly resulted, and without which he would have had no power to act, and attach the service, in the performance of which he was engaged, to the *antecedent* act of enrolment?

The division being certified here, the question, whether the service of a *notice of the draft* was a service relating to the *enrolment*, within the meaning of the 12th section of the act of 1864, was now before this court for resolution?

*Mr. Speed, A. G., and Mr. Coffey, special counsel of the United States, contended (Messrs. McDonald and Niblack, contra)* that the act of March 3, 1863, to which the one under which Scott was indicted is an amendment, provided a *system* for the enrolment and calling into service of the military forces of the country; that the execution of the details of the act was intrusted to three officers, called a board of enrolment; that the duties of this board did not end with the ascertainment of the names of persons liable to a draft and placing them on a list kept for that purpose, but extended to all acts necessary to place the drafted man in actual service, and under the control of his military commander; that the word " enrolment" was used as a general term, and included *all* the services required to put the drafted man into such ser-

vice and under such control; that the law intended to prevent resistance to any lawful act of this board, and to protect the lives of its members and their agents, while engaged in such service; and the counsel inferred as a conclusion that the answer should be in the affirmative, and with the effect, of course, of not making any arrest of judgment.

Mr. Justice MILLER delivered the opinion of the court.

The argument made in behalf of the United States is entitled to much consideration, and if there were nothing in the other provisions of the two statutes which have been discussed, to lead to the inference that Congress used the word enrolment in a narrower sense than the government would assert, it is not improbable that the court would assent to the soundness of the proposition made.

It is to be observed, however, that this construction of the word enrolment must depend entirely upon the statute for its support, as there is nothing in the derivation of the word, or in its ordinary use, which would justify such a meaning. It may be defined to be the act of inserting in a list or roll; and in reference to the purpose of calling the able-bodied men of the country into its service, its usual meaning is fully satisfied when the names of the persons liable to such service are placed on a roll or register. We accordingly find that the first duty imposed by the act on this board of enrolment, is to ascertain who those persons are, and place their names on a register. This catalogue is properly called the roll, and the completion of it, the enrolment of the military force of the country.

The title of the act of 1863, which is referred to and incorporated into the amendatory act of 1864, confirms this definition of the word enrolment. It is called "An act for enrolling *and calling out* the national forces, and for other purposes." Here the word enrolling is not used as the equivalent for all the acts necessary to bring the soldier into service; for it is implied that the enrolling is one thing, and the calling out is another. Otherwise, these last words are without meaning.

A further examination of the two statutes tends still more to confirm this view of the signification attached to the word enrolment. By those acts the boards of enrolment are directed to ascertain the persons liable to military duty, to determine their exemptions, to classify them and make proper lists of them; and there their duty, as a board, ceases, so far as it depends on the statute. They have no authority, under the statute, to make a draft, or to call out the forces. This is dependent on the proclamation of the President. The enrolment may be completed and all the duties of the board performed and ended, without a draft taking place. How, then, can it be said that the enrolment includes the draft?

Again, the enrolment is a matter which is under the joint control and supervision of all three of the officers who constitute the board. But by section three of the act of 1864 the provost marshal alone is charged with the duty of making and supervising the draft.

Looking at these provisions of the act, the conclusion would seem to be, that if the word enrolment, as used in section twelve of the act of 1864, is to have the enlarged meaning which is contended for, it must have a different meaning there from that which belongs to it and its cognate words in other parts of the two acts on the same subject.

But if we consider attentively section twenty-five of the original act of 1863, in connection with the section which we are called upon to construe, we shall be forced to the conclusion that the word enrolment in the latter, does not include the draft.

By the former it is enacted, that if any person shall resist any draft of men enrolled under this act, or shall counsel or aid any person to resist any such draft, or shall assault or obstruct any officer making such draft, or in the performance of any service relating thereto, such person shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding two years, or by both such fine and imprisonment.

It will hardly be asserted that the act of 1864 repeals this

provision of the act of 1863; for there is no express repeal, and repeals by implication are allowed only when the two provisions are so inconsistent that they cannot both be permitted to stand. No such inconsistency exists in this case; for using the words *draft* and *enrolment* in their ordinary sense both acts can stand,—the one punishing resistance to the enrolment, and the other resistance to the draft.

If both these sections, in these two acts, are to stand, it is impossible to construe them both as defining and punishing the offence of resisting the draft: first, because the punishment denounced by the act of 1863 is limited to a fine of five hundred dollars, or two years' imprisonment, or both, while the punishment prescribed by the act of 1864 may extend to a fine of five thousand dollars, or imprisonment for five years, or both; secondly, because the act of 1863 describes and well defines offences relating to the draft, and says nothing about offences relating to the enrolment, while the other, with equal clearness, defines offences relating to the enrolment, and says nothing of the draft.

It may be said that the act of 1863 makes no provision for an assault resulting in death, while that of 1864 does; and therefore the provisions of the latter should be made to cover cases where the party murdered was engaged in a service relating to the draft. It is possible, if the attention of Congress had been called to the omission, it would have been supplied; but certainly no court can go so far as that, in construing a statute whose penalty is death.

To make a party guilty of murder under the act of 1864, it is clear that the assaulting and resistance from which the the death results, must be an assault or resistance of a person engaged in precisely the same service as that which subjects the guilty party to fine and imprisonment, when it does not so result. The definition of the service in which the officer assaulted was engaged, can have no more liberal interpretation in the one case than the other. We have already shown that this does not include service in relation to the draft.

It is not difficult to explain the motives which governed

Congress in enacting section twelve of the act of 1864.   At the time the act of 1863 was passed, it was not anticipated that any trouble would be made to the officers engaged in merely obtaining the names of persons liable to draft, while it *was* supposed there might be some resistance, in particular cases, to the enforcement of the actual draft.   But a year's experience showed many defects in the act of 1863, requiring amendment.   Among these it was found that resistance to the enrolment was a thing to be expected, quite as often as resistance to the draft.   The extent and malignity of this resistance had also been found to be greater than had been anticipated, and the increased demand for soldiers, rendered more stringent legislation necessary.   Hence Congress, among many other amendments, provided for the case of resistance to the enrolment, and in doing so, made the penalty heavier than what it had provided for resisting the draft, and added a provision for punishment in cases of resistance resulting in the death of an officer or agent engaged in making the enrolment.   That it did not provide for a similar homicide occurring in a service relating to the draft, may have been an omission, but not a remarkable one, when we consider the many other weighty matters which the pressure of the rebellion forced on its attention, and also that the law of the State made full provision for cases of murder.

QUESTION ANSWERED IN THE NEGATIVE.