**LaVern DE MARRIAS, Petitioner,**

v.

**STATE OF SOUTH DAKOTA,**
**Respondent.**

**Civ. No. 922 N.D.**

United States District Court
D. South Dakota, N. D.
July 27, 1962.

L. R. Gustafson, Britton, S. D., for petitioner.

A. C. Miller, Atty. Gen. of S. D., Harold C. Doyle, U. S. Atty., Sioux Falls, S. D., and Frank Farrar, State's Atty., Britton, S. D., for respondent.

BECK, District Judge.

The petitioner's writ of habeas corpus, poses the question, whether the Circuit Court for the Fifth Judicial Circuit of South Dakota had jurisdiction to charge, try, convict and to sentence him for third degree burglary, SDC 13.3703 as amended, he at the time being an enrollee of the Sisseton-Wahpeton Sioux Indian Tribe, the crime having been committed on non-Indian patented land, within the original exterior boundaries of the Lake Traverse Reservation.

This state's Supreme Court on appeal, State v. De Marrias, S.D., 107 N.W.2d 255 (1961), affirmed the trial court as it held against the petitioner on the jurisdictional question with like result on a writ of certiorari denied on October 9, 1961, 368 U.S. 844, 82 S.Ct. 72, 7 L.Ed. 2d 42. See also application of De Marrias, 77 S.D. 294, 91 N.W.2d 480 (1958).

Generally, it is his position that the crime is one of the ten major ones referred to in Title 18 U.S.C.A., § 1153, which provides:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny *within the Indian country,* shall be subject to the same laws and penalties as all other persons committing any of the above offenses, *within the exclusive jurisdiction of the United States.* * * "
(Emphasis supplied).

and that the locus of the crime is "within the Indian country", Title 18 U.S.C.A., § 1151, where it is defined as:

" * * * (a) all land within the limits of any Indian reserva-

tion under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." Amendment 63 Stat. 94.

Otherwise expressed, he submits, that all lands within the limits of any "Indian reservation" has reference to all lands within the original exterior boundaries of Lake Traverse Reservation, and that the United States for that reason had exclusive jurisdiction since the crime was committed within those boundaries.

Pertinent to the inquiry thus compelled are the applicable provisions of the aforementioned sections, those of the Enabling Act of February 22, 1889 [1]:

"That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; * *.",

others in the December 12, 1889 Agreement [2] between the Government and the Sisseton and Wahpeton bands of the Dakota or Sioux Indians, by which they:

" * * * hereby cede, sell, relinquish, and convey to the United States all their claim, right, title and

1. 25 Stat. 676.

2. 26 Stat. 1036.

interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid remaining after the allotments and additional allotments provided for in article four of this agreement shall have been made.",

the Act of Congress ratifying that Agreement:[3]

"That the lands by said agreement ceded, sold, relinquished, and conveyed to the United States shall immediately, * * * be subject only to entry and settlement under the homestead and townsite laws of the United States, excepting the sixteenth and thirty-sixth sections of said lands, which shall be reserved for common school purposes, and be subject to the laws of the State wherein located: * * *.[4],

and the Proclamation of the President opening the ceded lands to settlement[5].

Also involved and to be considered is Chapter 106, Laws of South Dakota, 1901:

"Sec. 1. There is hereby relinquished and given to the United States of America and the officers and courts thereof exclusive jurisdiction and authority to arrest, prosecute, convict and punish all persons whomsoever who shall, upon any Indian reservation within the state of South Dakota, commit any act in violation of the penal laws of the United States.

"Sec. 2. No costs or charges incurred in the courts of the United States in the prosecution of offenses committed upon any Indian reservation shall be chargeable to the state of South Dakota.

"Sec. 3. This act shall be in full force and effect whenever the jurisdiction hereby relinquished shall be assumed by the United States.

"Sec. 4. All acts and parts of acts in conflict with the provisions of this act are hereby repealed.",

and the Act of Congress, 1903, 32 Stat. 793, Title 18 U.S.C.A., § 549, to the effect that the courts of the United States for the District of South Dakota under that section:

" * * * are hereby given jurisdiction to hear, try, and determine all actions and proceedings in which any person shall be charged with the crime of murder, manslaughter, rape, assault with intent to kill, arson, burglary * * * committed within the limits of any Indian reservation in the State of South Dakota."

The said Acts of 1889 and 1891 and the President's Proclamation, supra, constitute explicit manifestations as of the effective dates thereof of an intent by the Congress to restore to the public domain all unallotted lands within the Lake Traverse Reservation which were being opened for entry and settlement under the homestead and townsite laws of the United States and to make those areas subject to the laws of South Dakota.

Equally well manifested by those Acts, though only implicitedly inscribed, is a congressional intent to diminish the original area limits of the reservation, to separate jurisdiction and in the process and as an overall product of the entire arrangement to end "Indian country" and the reservation status. The unallotted lands thereafter ceased legally, to be a part of that reservation and therefore not within the "any Indian reservations" language contained in the relinquishment effected by said laws of 1901 and the Act of 1903. State v. De Marrias and Application of De Marrias, supra. See also State v. Sauter, 48 S.D. 409, 205 N.W. 25 (1925), State v. Jameson, 77 S.D. 527, 95 N.W.2d 101 (1959), Hollis-

---

3.  26 Stat. 1039.

4.  The cited provisions of the Enabling Act did not bar this legislation. See Or-

ganized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573.

5.  27 Stat. 1017.

ter v. United States, 8 Cir., 145 F. 773 (1906) and United States v. La Plant, D.C.S.D., 200 F. 92 (1911). As to "Indian country", it is said in Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471:

"The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."

Moreover, those laws and that Act were couched in general terms, " * * * any Indian reservation * * * ", and for that reason could not have affected the specifically declared intent by the Congress as reflected by said laws and Act. See Anderson v. Gladden, D.C.Or., 188 F.Supp. 666 (1960), where the court makes the comment:

"A statute expressly defining the jurisdiction of a court will not be controlled by implication arising from the enactment of subsequent statutes. Rosecrans v. United States, 165 U.S. 257, 17 S.Ct. 302, 41 L.Ed. 708; Acts of Congress in pari materia are to be construed with reference to each other. Greenleaf v. Goodrich, 101 U.S. 278, 25 L.Ed. 845. All statutes relating to the same subject matter must be construed together and in such case both will be given effect, if possible. United States v. Babbit, 1 Black 55, 66 U.S. 55, 17 L.Ed. 94; In re Henderson's Tobacco, 11 Wall. 652, 78 U.S. 652, 20 L.Ed. 235. New enactments of a fragmentary nature on a subject covered by previous general legislation should be fitted into the existing system and given effect in conformity thereto. United States v.

Jefferson Electric Mfg. Co., 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859. Congress is presumed to know its own laws and a later general statute does not overrule an earlier specific statute unless it does so clearly. United States v. Hawkins, 9 Cir., 1955, 228 F.2d 517 [16 Alaska 36.] repeals by implication are never favored and before the repeal of a statute will be implied, there must be an irreconcilable conflict between such statutes. United States v. Taylor, 104 U.S. 216, 26 L.Ed. 721; United States v. Scott, 3 Wall. 642, 70 U.S. 642, 18 L.Ed. 218; Davis v. Hutchinson, 9 Cir., 1929, 36 F.2d 309."

As for the contention that the government's acceptance of the proffered extinguishment, necessarily included the opened part of the reservation, in view of the amendment [6] to the acceptance act of 1903, viz. " * * * notwithstanding the issuance of any patent * * * ", suffice it to say that the scope of the acceptance must be determined on the basis of the legislative language in 1903 by which it took effect; that the acceptance encompassed no more than the 1901 offer and that the amendment, since its terms, too, are general, under the rule espoused, can not be held to apply.

Kills Plenty et al. v. United States, 8 Cir., 133 F.2d 292 (1943) did not involve special acts of Congress limiting the interpretation of the words "within the limits of any Indian reservation" as they were used in the Act of 1903, Sec. 549, Title 18 U.S.C.A. and is for that reason not in point under the facts in this case.

Like negative effect, must be given to Seymour v. Schneckloth, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 and essentially for the same reason. The distinguishing feature is pointed to by the court in that case as it places emphasis on the fact that the north half of the Colville Indian Reservation had been "vacated and restored to the public domain" but that the south half thereof hadn't,

6. Sec. 1151, supra. This amendment took effect in 1949.

instead expressly reserved by the government for the use and occupancy of the Colville Indians. Here it was patently otherwise. As for the "checkerboard jurisdiction" argument, let it be said that it can not be applied, inasmuch as such jurisdiction stemmed from said Acts of 1889 and 1891 and therefore had the approval of the Congress of the United States.

Writ denied.