GEORGE HUNT, Appellant, *v.* THE STATE OF KANSAS, Appellee.

*Criminal Appeal from Miami County.*

Where one member of the " United Tribes" (Kaskaskias, Peorias, Piankeshaws and Wea Indians) killed another member, the record failing to

show that the homicide was committed within the limits of any Indian reserve, *held* that such Indian cannot claim more than a foreigner whose nation has treaty relations with us, that there are no general exemptions of foreigners from the duty of observing our laws, while here; our law binds and protects alike, all persons, native or foreign, found within our territory [Bishop Cr. L., §§ 584, 593,], to which rule Indians are subject; and, *held* that the court below did not err in so charging the jury.

The opinion contains a full statement of the facts of the case.

. *W. R. Wagstaff*, for the appellant.

*Attorney General, Hoyt*, for the State.

*Wagstaff* submitted :

1. An Indian is not a citizen, but a domestic subject, 7 *Opin. Att'y Gen'l*, 746 ; *Acts* 39*th Congress, Pamph.*, p. 27.

2. The laws of Kansas declaring certain Indians citizens, for the purpose of suing and being sued, are in contravention of the laws and treaties of the United States, and of no force. *Comp. L.*, 602.

3. The Indians are a separate and distinct people, and cannot look to the state for protection, and their conduct cannot be measured by the standard of state laws. *Yellow Beaver* v. *Miami Co. Com'rs, Sup. Ct., Dec. Term*, 1866; *U. S.* v. *Holliday*, 3 *Wallace*, 407.

4. Where Indians reside within territorial limits of a state, and are subject to the laws of congress or treaty stipulations, the state cannot withdraw them from the operation thereof, notwithstanding it may confer upon them rights and citizenship. *Cherokee.* v. *Georgia*, 6 *Pet.*, 1 ; *Worcester* v. *Georgia, id.*, 515.

5. The organization of the confederated tribes is

preserved intact, and recognized by the government, and are therefore a distinct people, separate from the jurisdiction of the state, governed exclusively by federal law. There can be no divided authority. *Blue Jacket* v. *Com'rs Johnson Co.*, 5 *Wallace*, ——; *U. S.* v. *Holliday*, 3 *Wallace*, 407.

6. Questions of state sovereignty are not involved, the state having accepted the situation, saving all rights of Indians unimpaired. *See Shawnee Treaty,* *Nov.*, 1854, 10 *Stat. at Large*, 1063 ; *Treaty, Aug. 10th,* 1854, *id.*, 1082.

In the latter treaty, it is agreed that should any difficulties arise, the laws of the United States afford the rule of adjustment. 10 *Stat.*, *p.* 1084.

*The Attorney General* submitted :

1. The united tribes retroceded to the United States their reservation, and took lands in severalty by patent. 10 *Stat. at Large, Treaty of* 1854.

2. Though the rights of these Indians are to be vindicated by the laws of the United States, yet the admission of Kansas as a state upon an equal footing with the other states, took the territory within its boundaries, out of the "Indian country," and transferred jurisdiction over crimes upon the state, precisely as other states.

3. The treaty stipulation (1854) conferring authority upon the United States, to arrest and try offenders among the members of this tribe, placed the tribe in this respect upon an equal footing with the citizens of the territory, and by operation of the act of admission, reduces them to the same level with the citizens of the state.

4. Laws of the United States are not applicable to crimes committed by one Indian against the person or property of another Indian, within the "Indian country." *Intercourse Act, U. S.*, 1834.

5. Tribal sovereignty, so far as this tribe is concerned, and in respect to crimes, was extinguished by the treaty of 1854. The jurisdiction of the state to arrest, try and punish members of the tribe for crimes committed in the state, and outside any reservation, does not "impair the rights of person or property" pertaining to them, and is not inconsistent with the provisions of the act of admission.

6. Congress derives no power under the constitution, nor has it exercised any assumed power, to deprive the state of its sovereign right to punish offenses committed within its limits, excepting such as arise from regulations relating to commerce and traffic. *U. S.* v. *Rogers*, 4 *Howard*, 567; *U. S.* v. *Bailey*, 1 *McLean, C. C. R.*, 241.

7. "The right to enforce her criminal laws in any part of the soil which became a part of the State of Kansas, by the act of admission, is a necessary incident to her becoming one of the states of the Union, on an equal footing in all respects with the others." *Opinion of Justice Wilder, U. S.* v. *John Ward, C. C. U. S. Dist. of Kansas, May T.*, 1863.

8. The record shows the crime to have been committed in Miami county, and that the accused, together with the deceased, were inhabitants of that county. It is not pretended that the crime was committed on a reservation.

9. The cases cited by plaintiff in error, to wit: Blue Jacket *v.* Commissioners of Johnson County, Yellow Bearer *v.* Commissioners of Miami County, U. S. S.

C., Dec. T., 1866 ; U. S. *v*. Holliday, 3 Wallace, 407 ; Cherokee *v*. Georgia, 5 Peters, 1 ; and Worcester *v*. Georgia, 6 Peters, 515, are not in point.

· *Per Curiam*, BAILEY, J.

This case comes before us on an appeal from the district court of Miami county.

The appellant, George Hunt, was tried for murder in the first degree, and by the jury found guilty of manslaughter in the fourth degree, for killing a Wea Indian named Mah-cah-tah-chin-quah.

On the trial, the defendant offered evidence tending to prove that both Hunt and the man he was charged with killing were Indians of the Wea tribe, which Wea tribe inhabit the said county of Miami, and together with the Kaskaskias, Piankeshaws and Peorias, constitute what is known as the United or Confederate tribes ; and that these confederate tribes had a tribal government of chiefs and council, and maintained treaty relations with the government of the United States ; and these facts were admitted on the part of the prosecution. Whereupon the counsel for the defendant asked the court to charge the jury as follows : "If the jury find and believe from the evidence that the defendant, George Hunt, and the said deceased, Mah-cah-tah-chin-quah, at the time of the alleged homicide, were Indians, and members of the Wea tribe of Indians, inhabiting said county of Miami, and one of the united tribes of Kaskaskia, Peoria, Piankeshaws and Wea Indians ; and that said tribes maintain a tribal condition, having a council, chiefs, and a tribal government ; and having tribal relations by treaty with the government of the United States, and

a United States agent for the management of their affairs, then the jury must acquit the defendant and return a verdict of not guilty, although they may believe that the defendant in fact killed the deceased, as alleged in the information."

The court refusing to give the instructions as prayed for, the counsel for defendant excepted, and afterwards moved to set aside the verdict, and for a new trial, because of such refusal.

The motion for a new trial being overruled, the case is appealed to this court, and the refusal of the court below to give the above charge as prayed for, is the only point relied on.

It does not appear that the killing charged in the information, and of which the defendant was found guilty, took place within the limits of any Indian reserve ; nor is that point adverted to in the instructions prayed for by defendant's counsel, as it undoubtedly would have been if such had been the fact.    The county of Miami is one of the first settled, most populous and flourishing counties in the state, and the Indian tribes mentioned in the charge asked to be given to the jury, occupy but a small portion of the territorial extent of the county.    And we are asked to decide that Indians may kill Indians, outside of Indian reservations, if in the same county in which their reservations are situated, in the midst of white settlements, under the shadow of the school and court houses, and church, without incurring any responsibility to the laws of the State of Kansas, because they belong to a tribe or nation of Indians having treaty relations with the United States, and an agent resident among them as the representative of the United States.

If such were indeed the law. it would be a matter of

grave concernment to the population of many of our counties bordering on or including Indian reservations within their defined boundaries; but we are of opinion that giving to the Indian tribal government the very highest position it can claim as a power having treaty relations with the government of the United States, and an Indian agent as *charge d' affaires* representing the United States, such Indian tribe cannot claim for its members any greater privileges or immunities than an European nation—say France, for example, having treaties with the United States and represented by its minister plenipotentiary at Washington, the United States being in like manner represented by a minister plenipotentiary at Paris.

Suppose, now, the case of two Frenchmen direct from Paris, it may be, or resident in Miami county for years, it matters not which, and one is killed by the other in the streets of Paola, or elsewhere in the body of the county of Miami, in the same manner that the decedent Wea Indian was killed by his Indian brother, the appellant, could there be any question as to the jurisdiction of the offense? Would it be thought, for a moment, that the case must be referred to the French minister, at Washington, or to the home government, at Paris? In Bishop's Criminal Law we find the rule of international law laid down briefly, as follows: "In the United States there are no general exemptions of foreigners from the duty of obeying our laws, while here. We have never permitted any foreign laws to supersede our own, further than they are entitled to do under the general law of nations." *Bishop on Crim. Law,* § 584.

By the law of nations, ambassadors, other public ministers and consuls are exempt from responsibility

to the local law ; and, having considered these exceptional cases separately, the learned author goes on to remark : "Subject to the exceptions enumerated above, which severally rest on peculiar reasons, the doctrine is general that our laws bind alike all persons, natives or foreigners, found within our territory.  On the other hand, also, they equally protect all ; and thus if, even in time of war, an alien enemy comes here, it is murder to kill him, except in the actual heat and exercise of war.  If he submits and lays down his arms, his life must be spared."   *Bishop's Crim. Law*, § 593.

Evidently this is the law.  Every civilized nation claims and exercises the right to maintain order and punish crime within its territorial limits.  We think the Weas, Piankeshaws, Kaskaskias and Peorias will have to abide by the same rules in this respect that have so long governed in the case of the English, French, Spanish and Portuguese nations, beyond the sea.  Or if, in any respect, the rule is different, it is not in favor of tribes like the Weas and their confederates, confessedly dependent upon the United States, numbering their population by scores, or, at most, by hundreds, as against nations like those mentioned, numbering by millions and tens of millions.  A Wea can claim no greater immunities against punishment for crime than a Frenchman.

The judgment of the court below affirmed.

All the justices concurring.