Argued September 11, affirmed November 13, 1957

# ANDERSON *v.* BRITTON
318 P. 2d 291

[ 1 ]

*Leonard H. Waterman,* Burns, and *Robert L. Welch,* Lakeview, argued the cause for appellant. With them on the briefs was Herbert P. Welch, Lakeview.

*Richard Beesley,* District Attorney, Klamath Falls, argued the cause and filed a brief for respondent.

C. E. Luckey, United States Attorney, Portland, filed a brief as amicus curiae.

KESTER, J.

This is a habeas corpus proceeding against the sheriff of Klamath county. The writ was issued and the sheriff made his return showing that plaintiff was held under an order of commitment pursuant to a conviction of second degree murder. Plaintiff made replication to the effect that the conviction was void because the state court was without jurisdiction; and in this connection he alleged that plaintiff is a tribal Indian, that the alleged homicide was committed, if at all, within the Klamath Indian reservation, and that the federal courts have exclusive jurisdiction over the alleged offense, notwithstanding Public Law 280 of the 83rd Congress. The trial court sustained a demurrer to the replication, plaintiff refused to plead further, the writ was dismissed, and plaintiff now appeals.

The facts with respect to the homicide are detailed in *State v. Anderson,* 207 Or 675, 298 P2d 195, wherein plaintiff's conviction was affirmed.

For present purposes, it is sufficient to note that the homicide in question was committed November 5, 1954, in Klamath county, and on November 12, 1954, plaintiff was indicted by the grand jury of Klamath county for first degree murder. He entered a plea of

not guilty, the cause was transferred to Harney county for trial, and he was there convicted of murder in the second degree and sentenced to life imprisonment. The trial court was of the opinion that the Harney county jail was not a safe jail in which to keep the prisoner pending his motion for new trial and appeal, so an order was made directing that he be confined in the Klamath county jail until the appeal was heard and decided. The conviction was affirmed by this court on May 31, 1956, and his petition for rehearing was denied June 27, 1956. The present petition for writ of habeas corpus was filed in Klamath county on June 13, 1956, at which time plaintiff was still in the Klamath county jail.

■ We were advised by counsel at the argument that plaintiff is no longer in custody of the defendant, but was transferred to the Oregon State Penitentiary after the ruling on the demurrer to the replication in the lower court. The warden of the penitentiary is not a party to this proceeding. The question therefore arises whether the proceeding has become moot, as ordinarily it must be against the one having physical custody of the plaintiff. See 39 CJS 622, Habeas Corpus § 77b; cf ORS 34.420; *Fehl v. Lewis*, 155 Or 499, 505, 64 P2d 648; *White v. Gladden*, 209 Or 53, 303 P2d 226.

■ Although suggested upon argument, this question has not been briefed or argued here. We are of the opinion, however, that the function of habeas corpus cannot be defeated by a transfer of custody after a ruling in the trial court and pending appeal to this court. To hold otherwise would permit the jurisdiction of the court to be thwarted after it has once attached.

The common-law rule was that upon the return of the writ and the production of the person suing it out,

the authority under which the original commitment took place was superseded, and thereafter the prisoner was in the custody of the court until the proceedings on the writ were finally determined. *Barth v. Clise,* 12 Wall 400, 79 US 400, 20 L ed 393. See 25 Am Jur 245, Habeas Corpus § 148; 39 CJS 659, Habeas Corpus § 94. The same principle seems to be embodied in ORS 34.640, which provides:

> "Custody of party pending proceedings. Until judgment is given upon the return, the party may either be committed to the custody of the sheriff of the county, or placed in such care or custody as his age and other circumstances may require."

■ Since there is a statutory right of appeal in habeas corpus, the proceeding is not finally determined until the appeal, if taken, has been decided. See *Macomber v. Alexander,* 197 Or 685, 692, 255 P2d 164.

■ In this case the order of the trial court dismissing the writ also remanded plaintiff to the custody of the sheriff of Klamath county. Notwithstanding his transfer to the penitentiary, for the purpose of this proceeding he remains constructively in the custody of the sheriff pending determination of the appeal. See *Pomeroy v. Lappeus,* 9 Or 363, 365. Should it become necessary to reinstate the writ, the warden could be made a party defendant in this court.

The next question arises out of the fact that the matter plaintiff now seeks to raise could have been, but was not, presented in the criminal case itself. In *Macomber v. State,* 181 Or 208, 218, 180 P2d 793, we said: "* * *. Normally, the extraordinary remedy of habeas corpus is not available to those who neglected to appeal * * *." In *Huffman v. Alexander,* 197 Or 283, 350, 251 P2d 87, 253 P2d 289, we said: "* * * convicted persons should exhaust their remedies in the

nature of an appeal and by motion for a new trial before resorting to habeas corpus, whenever on the facts of the case, either of those procedures would provide an adequate remedy." And in *Blount v. Gladden*, 203 Or 487, 280 P2d 414, we held that habeas corpus could not be used to relitigate questions which had been decided on the appeal of the criminal case. See also *Anderson ex rel. Poe v. Gladden*, 205 Or 538, 551, 288 P2d 823, cert. den. 350 US 974, 100 L ed 845, 76 S Ct 451; *Alexander v. Gladden*, 205 Or 375, 395, 288 P2d 219.

From the foregoing cases it would seem to follow that habeas corpus will not lie where an appeal was taken and the question was not raised, when if it had been raised, the remedy by appeal would have been adequate. It begs the question to say that want of jurisdiction renders the judgment absolutely void, because habeas corpus can never be used for collateral attack on a judgment unless the judgment is void. *Garner v. Alexander*, 167 Or 670, 674, 120 P2d 238, cert. den. 316 US 690, 86 L ed 1761, 62 S Ct 1281; *Huffman v. Alexander*, supra, 197 Or at 297, 299; *Smallman v. Gladden*, 206 Or 262, 270, 291 P2d 749.

Closely allied to the foregoing rule is the doctrine that, in the absence of special circumstances, the inquiry on habeas corpus is limited to examination of facts appearing upon the face of the record, and that evidence outside the record of the principal case will not be received to impeach the judgment. The authorities on this question were recently reviewed by the Supreme Court of California in *Application of Carmen*, 313 P2d 817, decided August 2, 1957.

In that case Carmen had been convicted of murder and of assault with intent to murder, committed in

1950, and upon appeal from the conviction it was suggested at the oral argument that facts might be adduced showing that Carmen and his victim were Indians, and that the crimes had been committed within Indian country, with the result that exclusive jurisdiction over the offense might be vested in the federal courts. Those facts did not appear in the record, however, and the Supreme Court of California denied an application to produce such additional evidence on appeal, and it affirmed the conviction. *People v. Carmen,* 228 P2d 281, 265 P2d 900, 273 P2d 521.

Thereafter the same court issued a writ of habeas corpus and made an order of reference. The referee reported that the petitioner and his victim were both unemancipated, tribal Indians, and that the crimes occurred on Indian allotment lands held in trust by the United States, which were not, however, part of a reservation.

Thereafter the writ was discharged, and the court declined to pass upon the effect of the referee's findings or the sufficiency of the evidence to support those findings, on the ground that:

"* * * in the absence of exceptional circumstances, which are not present here, petitioner may not contest, in this collateral attack upon the final judgment of conviction, the trial court's determination and exercise of jurisdiction, upon the basis of new and additional facts which do not appear in the trial court record. [313 P2d at 818]

"* * * * *

"* * *. Petitioner therefore should have alleged and proved in the trial court any facts which he now claims might have had the effect of vesting exclusive jurisdiction in the federal courts." (313 P2d at 819.)

Four justices concurred in the opinion of the court, and three dissenting opinions were filed, so that the various aspects of the problem were fully explored, and recent decisions of the Supreme Court of the United States were considered at length. Part of the difference within the California court appears to have revolved about the question whether the case presented "exceptional circumstances" so as to take it out of the rule enunciated by the majority.

Essentially the same question was considered by this court in *Huffman v. Alexander,* supra, where Chief Justice BRAND, speaking for the court, distinguished between two different types of attack by habeas corpus upon judgments of conviction:

"* * *. By the first, the plaintiff expressly or by implication admits that the recitals in the record as to what was actually said and done in open court are true, but he seeks to present evidence outside of the judicial record which goes behind but does not contradict the essential recitals thereof. Illustrations of this type include cases in which a waiver of some constitutional right was induced by fraud or was the result of gross ignorance or the like. By the second method of attack the plaintiff alleges and seeks to prove that the events recited in the judicial record in fact never happened. The first method goes behind the record to invalidate it but does not directly contradict it. The second challenges the truth of the judicial recital itself." (197 Or at 303)

As to the first of these methods of attack, the conclusion of the court was:

"* * * we deem it firmly established by modern decisions, both state and federal, that the recitals in the judgment of conviction and sentence, although presumed to be both true and valid, may nevertheless be attacked by evidence outside the

record which tends to invalidate but not directly to contradict the judicial recital." (197 Or at 313-14)

As to the second, the opinion says:

"We hold, as a general rule, that recitals in the judicial record, showing what was said and done in the court, import absolute verity, and therefore cannot be collaterally attacked in habeas corpus." (197 Or at 317)

The present case is more nearly like the first of these classes, and under that rule the inquiry would be permitted, were it not for the additional fact that no reason is shown why the point could not have been raised in the criminal case and upon appeal from the judgment of conviction. In the Huffman case sentence was entered upon a plea of guilty, and there was no appeal from the judgment of conviction. Indeed it was contended that petitioner had been wrongfully deprived of his right of appeal. Therefore there was reason in the Huffman case to permit evidence on habeas corpus of alleged fraud in procuring the waiver of indictment, that would not exist in this case, where petitioner had ample opportunity to adduce at the trial any facts showing want of jurisdiction, and to present the legal effect of those facts upon appeal, but failed to do either.

■ We gather from statements made upon the argument that counsel for plaintiff had in mind at the trial the jurisdictional question now presented, but deliberately refrained from raising it until after the decision on appeal from the conviction. Under these circumstances we would not ordinarily consider the matter upon habeas corpus. However, because of the public importance of the question (involving, as it does, a large field of law enforcement), we feel war-

ranted in considering the case on its merits, notwithstanding plaintiff's failure to exhaust his previous remedies and his obvious gambling on the outcome of the prior case.

Plaintiff challenges the constitutionality of Public Law 280 of the 83rd Congress (67 Stat 588), approved August 18, 1953, which enacted a new section, known as § 1162 of Title 18, United States Code. Its applicable portion provides:

"§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country

"(a) Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

"State of          Indian country affected
"*    *    *    *    *

"Oregon ....................... All Indian country within the State, except the Warm Springs Reservation."

Public Law 280 also conferred on the state jurisdiction over civil causes between Indians or to which Indians are parties which arise in the same areas of Indian country; it had certain saving clauses with respect to Indian property and with respect to treaty rights for hunting, trapping or fishing; it rendered inapplicable certain provisions of federal law dealing with Indian offenses; and it concluded with the following:

"Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the con-

sent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

"Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

Defendant's demurrer to the replication admits that plaintiff is of Indian blood, that he was and is a duly and regularly enrolled member of the Klamath tribe of Indians, that he resided upon the Klamath Indian reservation in Klamath county, Oregon, that the Klamath tribe is a recognized tribe or community of Indians organized under a constitution and bylaws approved by the Secretary of the Interior and maintaining a tribal government, and that the alleged homicide was committed, if at all, within the boundaries of the Klamath Indian reservation in Klamath county, Oregon.

The first degree murder statute (ORS 163.010), under which plaintiff was indicted, and the second degree murder statute (ORS 163.020), under which he was convicted, both refer to "any person" and "every person." There can be no doubt that such statutes would be applicable to plaintiff, except for the circumstance

that he was an Indian and that the act occurred in Indian country. No further legislation or constitutional provision dealing with this subject has been adopted in Oregon since the enactment of Public Law 280. Therefore the question is presented whether Public Law 280 is valid, and whether it has the effect of removing the federal government from the field and of conferring jurisdiction over this subject on the courts of Oregon, without further action by the state.

At the outset we note that the validity of Public Law 280 was assumed by the California Supreme Court in *Application of Carmen,* supra. That case arose prior to the effective date of the Act, at a time when jurisdiction over Indian offenses in Indian country was clearly vested in the federal courts, but the Act (which applied to California as well as Oregon) became effective before the final decision in the case. In referring to it the California court said:

> "* * *. * * * petitioner's claims are based entirely upon federal statutes (§§ 1151, 1152, 1153, 3242, Title 18, U.S.C.A.), the effect of which has been changed since petitioner committed his offenses, by legislation giving the courts of this state unquestioned jurisdiction over offenses committed in 'All Indian country within the State.' § 1162, Title 18, U.S.C.A., as amended Aug. 24, 1954."

However the opinion does not indicate that the question of validity was presented in that case. We have found no case since enactment of Public Law 280 which directly passes upon its validity in the respects here concerned.[1]

---

[1] In Klamath & Modoc Tribes et al. v. Maison, 139 F Supp 634 (1956) the U.S. District Court for Oregon held that Public Law 280 did not extend the hunting and trapping laws of the state of Oregon to Indians upon the Klamath reservation. Such rights were established by the treaty of 1870 and were expressly reserved by Public Law 280.

Plaintiff claims that the power to define and punish crimes committed by Indians on Indian reservations is exclusively and inherently federal. Based on this premise, he then argues that the federal power cannot constitutionally be delegated to the states. He also argues that Public Law 280 is not self-executing, but requires implementing legislation by the state; and that any such legislation by the state would itself be invalid as lacking in uniformity, because under Public Law 280 the Warm Springs reservation would have to be excepted.

The latter arguments can be disposed of quickly. ORS 131.210 (adopted in 1864) provides:

"Every person, whether an inhabitant of this state or any other state, territory or country, is liable to punishment by the laws of this state for a crime committed by him in this state, except where such crime is by law cognizable exclusively in the courts of the United States."

Prior to Public Law 280, murder by an Indian, within the Indian country was "cognizable exclusively in the courts of the United States." Title 18, U. S. Code, provides:

§ 1152: "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

§ 1153: "Any Indian who commits * * * murder * * * within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

§ 3242: "All Indians committing any of the following offenses, namely murder, * * * on and within the Indian country, shall be tried in the same courts, and in the same manner, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

■ Public Law 280 provides that "the provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section," but it does not mention § 3242. Plaintiff argues that the failure to mention § 3242 leaves it unimpaired, with the effect that the federal courts still have exclusive jurisdiction, notwithstanding Public Law 280. However, § 3242 is essentially procedural, and since plaintiff's construction would render Public Law 280 nugatory, we have no hesitation in holding that § 3242 was repealed by implication, to the extent that Public Law 280 is applicable.

■ Hence if Public Law 280 is valid, no further legislation was required to render plaintiff subject to the state laws dealing with murder. Sections 6 and 7 of Public Law 280 were apparently intended for states whose existing constitutions and statutes were not adequate to fill the gap left by federal withdrawal, but such is not the case in Oregon. Since no implementing legislation is necessary, and the existing laws as to murder do not distinguish between Indians and others, we will not speculate as to the constitutionality of statutes not yet enacted.

The real question involves consideration of the fundamental nature of the federal power over Indian affairs. If that power is inherent solely in the federal government, to the necessary exclusion of the state, then the question of delegation may become important. But if the state has residual power over Indians and Indian territory, which is merely in suspension so long as the federal government chooses to occupy the field, then a withdrawal by the federal government does not vest any new power in the state but merely removes an impediment to the exercise of pre-existing power.

The United States Constitution contains no direct grant of power to the federal government over criminal offenses by Indians or in Indian territory. Nevertheless it has been universally recognized that the federal government has plenary power over Indian affairs, at least so long as Congress chooses to exercise it. That power has been variously thought to stem from: (1) the power to regulate commerce with the Indian tribes (Art I, § 8, cl 3); (2) the treaty-making power (Art II, § 2, cl 2) and the corollary power to implement treaties by legislation; (3) the power over federal property (Art IV, § 3, cl 2); (4) the war powers (Art I, § 8, cl 11, et seq.); (5) the power to admit new states (Art IV, § 3, cl 1) and inferentially to prescribe the terms of such admission; and (6) the power to make expenditures for the general welfare (Art I, § 8, cl 1). See Cohen, Handbook of Federal Indian Law, ch 5 (U.S. Dept. of Interior publication).

Whatever its theoretical source, the exercise of federal power has also had a practical basis. In *U.S. v. Kagama*, 118 US 375, 383-85, 6 S Ct 1109, 30 L ed 228, in sustaining the validity of the federal statute which gave the federal courts exclusive jurisdiction over crimes by one Indian against another within an

Indian reservation (23 Stat ch 341, 362, § 9, 385, March 3, 1885, the predecessor of what is now 18 USCA § 1153) the court made the following statement which has since been quoted many times:

"It seems to us that this is within the competency of Congress. These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. Dependent largely for their daily food. Dependent for their political rights. They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.

"* * * * *

"The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes." (Italics in original.)

Plaintiff relies heavily on the statement in the Kagama case, supra, that "it [the power over Indians] has never existed anywhere else [than in the federal government]." That statement, however, cannot be accepted without qualification.

In *Red Hawk v. Joines*, 129 Or 620, 634, 278 P 571, where this court upheld jurisdiction in the state court

of a replevin action by an Indian against a white man arising out of the taking of some cattle on the Umatilla Indian reservation, the court adopted the opinion of circuit judge James Alger Fee, in which it was said:

"It is a familiar principle that where Congress has the right to take over exclusive jurisdiction, and has not covered the particular subject under consideration, the power of the state courts is upheld until Congress acts. See Sioux Remedy Co. v. Cope, 235 U.S. 197 (59 L. Ed. 193, 35 Sup. Ct. Rep. 57); Territory of New Mexico ex rel. E.J. McLean & Co. v. Denver etc. R. Co., 203 U.S. 38 (51 L. Ed. 78, 27 Sup. Ct. Rep. 1); Sligh v. Kirkwood, 237 U.S. 52 (59 L. Ed. 835, 35 Sup. Ct. Rep. 501).

"It does not follow because the authority of the federal government over the Indians and the Indian country is supreme that the state and territorial government have no jurisdiction whatever over them, and over Indian Reservations. In the absence of provisions to the contrary the lands embraced therein occupied by Indian tribes are a part of the state territory, and subject to its jurisdiction except so far as concern the government and protection of the Indians themselves, and for purposes relating to treaties and agreements between the United States and Indians, in which respects the jurisdiction of the United States is exclusive: Wagoner v. Evans, 170 U.S. 588 (42 L. Ed. 1154, 18 Sup. Ct. Rep. 730); Thomas v. Gay, 169 U.S. 264 (42 L. Ed. 740, 18 Sup. Ct. Rep. 340); Draper v. United States, 164 U.S. 240 (41 L. Ed. 419, 17 Sup. Ct. Rep. 107), Utah & Northern Ry. Co. v. Fisher, 116 U.S. 28 (29 L. Ed. 542, 6 Sup. Ct. Rep. 246)."

The same qualification was expressed in *State v. Columbia George*, 39 Or 127, 147, 65 P 604, which held that the exclusive power over Indian crimes on Indian reservations, which was vested in the federal courts by the Act of 1885, was not altered by the Dawes Act

of 1887 which allotted public lands to Indians and conferred citizenship on the allottees. In the opinion Mr. Justice WOLVERTON stated:

"The state courts have never had jurisdiction over the Indians within the Indian country or upon Indian reservations, *except as and in so far as the general government has relinquished the supervisory control and authority over them.*" (Italics ours.)

The history of Indian affairs, particularly in recent years, has shown a decided trend toward the emancipation of the Indians, the withdrawal of federal control, and an attempt to assimilate the Indians into the community life of the various states. Some of the problems attendant upon that policy recently prompted the Oregon State Bar to appoint a special committee on the legal rights of Indians. The report of that committee in 1956 contained an excellent and concise summary of the trend, and excerpts from that report are attached to this opinion as an appendix. Further reference to the general aspects of the problem is unnecessary.

Assuming, as can be inferred from the Kagama case and similar language in other cases, that the federal power over Indian affairs (or at least the exercise of it) rests in part on considerations of necessity or expediency, because of the dependent relationship of the tribes to the United States, the need for such control naturally diminishes as the Indians progress away from their primitive state.

The determination of when the wardship status of Indians is to be terminated is a legislative or political question and not for the courts. In *United States v. Nice*, 241 US 591, 598, 36 S Ct 696, 60 L ed 1192, which upheld the federal prohibition of liquor traffic with

Indians whose land allotments were still held in trust, the court said:

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one *sui juris*, the tribal relation may be dissolved and the national guardianship brought to an end, but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial."

█ It is clear that the power over Indians, as such, is not so inherently federal as necessarily to exclude the states, because Indians outside of "Indian country" are subject to the general criminal laws of the states. *Tooisgah v. U.S.*, 186 F2d 93 (C. A. Okla. 1950).

█ And likewise the federal power over Indian country is not necessarily exclusive, because crimes by non-Indians committed on Indian reservations are subject to state laws. *U.S. v. McBratney*, 104 US 621, 26 L ed 869; *New York ex rel. Ray v. Martin*, 326 US 496, 66 S Ct 307, 90 L ed 261.

█ These examples illustrate that the inherent police power of the states applies both to Indians and to Indian country, except to the extent that the federal government has pre-empted the field. It follows therefore that the federal government may withdraw from the field, and turn the subject matter back to the states, when it chooses to do so.

█ Plaintiff does not point to any specific clause of the constitution which he claims is violated by Public Law 280. Instead he urges that the act is invalid because there is no constitutional authority to sustain it. In this connection he says that the federal power over the Klamath Indians and the Klamath reservation is based solely upon the treaty of February 17, 1870, between the United States and the "Klamath and

Modoc Tribes and Yahooskin Band of Snake Indians"
(16 Stat 707).

By that treaty the tribes ceded to the United States
all their claim to certain described lands, and in turn
the United States set aside a portion of those lands as
an Indian reservation. Among other provisions, Article
IX of the treaty provided:

> "The several tribes of Indians, parties to this
> treaty, acknowledged their dependence upon the
> government of the United States, and agree to be
> friendly with all citizens thereof, and to commit no
> depredations upon the person or property of said
> citizens, and to refrain from carrying on any war
> upon other Indian tribes; and they further agree
> that they will not communicate with or assist any
> persons or nation hostile to the United States, and,
> further, that they will submit to and obey all laws
> and regulations which the United States may pre-
> scribe for their government and conduct."

Plaintiff claims that the tribe agreed to submit only
to the laws and regulations of the United States, and
not to those of the state of Oregon; and that any powers
not surrendered to the United States remained in the
tribe, so that upon relinquishment by the federal gov-
ernment, the power reverts to the tribe itself. Plain-
tiff's argument negates any authority in either state
or federal government, except as derived from the
treaty.

It is true that various Indian tribes were for a
time treated as having some aspects of sovereignty,
that they were dealt with by means of treaties until the
Act of March 3, 1871 (16 Stat 566, 25 USCA § 71, see
Appendix, infra), and that treaties between them and
the United States have been held superior to state laws.
E.g. *Worcester v. Georgia*, 6 Pet 515, 31 US 350.

But it has also been held that the power of congress over Indian affairs is plenary, that it cannot be limited by treaty, and that an Indian treaty may be abrogated by congress, so long as individual rights acquired under the treaty are not destroyed. *Lone Wolf v. Hitchcock*, 187 US 553, 566, 23 S Ct 216, 47 L ed 299; *Choate v. Trapp*, 224 US 665, 671, 32 S Ct 565, 56 L ed 941. In the latter case the Supreme Court said:

"* * *. * * * the plenary power of Congress over the Indian Tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later statute. The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States."

It follows that the treaty of 1870 did not bind the United States to maintain its police power perpetually over the tribe, to the exclusion of the state. On the contrary, the treaty (so far as is here concerned) was on a parity with the federal criminal laws relating to Indians on Indian reservations, and either could be modified by subsequent enactment. The treaty was not the source of federal power, but it was merely a means by which the existing, but dormant, federal power was exercised. Upon its exercise the rights of the state were suspended until such time as the federal pre-emption should be relinquished, and the relinquishment could be accomplished by congressional act. What then, were the rights of the state prior to the treaty of 1870?

By the act admitting Oregon as a state (February 14, 1859; 11 Stat 383) Oregon was received into the Union "on an equal footing with the other states in all respects," and there was no exclusion of any

jurisdiction over either Indians or Indian territory. The operation of federal statutes then, as now, being limited to "Indian country" (Act of March 27, 1834, 10 Stat 270, ch 26, § 3) and there being no "Indian country" defined as such with respect to the Klamaths prior to 1870, it follows that between 1859 and 1870 the Klamaths, and the area later to become the Klamath reservation, were subject to state jurisdiction.

Therefore, if Public Law 280 in fact conflicts with the treaty of 1870 (which it is unnecessary to decide), the effect of the statute was to abrogate the treaty. Plaintiff has no such vested right in being tried by the federal, rather than the state courts, as would entitle him to complain of the abrogation. And the withdrawal of federal control leaves the subject in the hands of the state, where it was prior to the treaty.

We hold that Public Law 280 of the 83rd Congress is not unconstitutional, that under it the state of Oregon had criminal jurisdiction over this offense, and the demurrer to plaintiff's replication was properly sustained.

Affirmed.

## APPENDIX

Report of Oregon State Bar Committee on Legal Rights of Indians, 1956.

"1. Preliminary comment

"The legal status of Indians in the United States is unique. In earlier years, they were treated as neither citizens nor aliens. Nor were their tribes regarded as 'nations,' as that term is used in international law. Their relationship, either as individuals or as tribes, to the Government of the United States could hardly be defined in conventional legal terms. As observed by Chief Justice Marshall some 125 years ago. 'the condition of the Indians in

relation to the United States is perhaps unlike that of any other two people in existence.' (Cherokee Nation v. Georgia 5 Pet. 1, 17)

"Prior to 1871, the civil rights of Indians were governed largely by treaties made by the United States with the various Indian tribes. But by an act passed March 3, 1871, Congress terminated the prior method of dealing with the Indians through treaties and provided that:

" 'hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty.' (16 Stat. 566)

Thereafter, the United States governed the Indians directly, by the exercise of its legislative powers, rather than by contract, except that the obligations of treaties made prior to March 3, 1871 were recognized as binding. However, for practical reasons in a few instances, contracts were made with tribes in certain areas. Nevertheless, the 1871 Act marked the first major change in the attitude of the United States toward the Indians.

## "2. Citizenship

"The second major change in governmental attitude toward Indians, which came about more slowly, related to the status of Indians as citizens. In 1884, the Supreme Court held that an Indian was not, merely by reason of birth within the United States, a citizen of the United States within the meaning of the 14th Amendment. (Elk v. Wilkins, 112 US 94)

"But subsequently, by a series of acts beginning in 1887, Congress extended citizenship to certain Indians who had 'adopted the habits of civilized life' (24 Stat. 390), to 'every Indian in Indian Territory' (31 Stat. 1447), to all Indians who had served in the armed forces of the United States in World War 1 (41 Stat. 350), to 'all members of the Osage

Tribe of Indians' (41 Stat. 1250), and finally in 1924 to 'all non-citizen Indians born within the territorial limits of the United States.' (43 Stat. 253)

## "3. Property rights

"The United States always has exercised some control over the property rights of Indians. The constitutional authority for the exercise of that power has been sustained on various practical grounds. In 1942, the Supreme Court stated it in this way:

" 'From almost the beginning, the existence of federal power to regulate and protect the Indians and their property against interference even by a state has been recognized. \* \* \* This power is not expressly granted in so many words by the Constitution, except with respect to regulating commerce with the Indian tribes, but its existence cannot be doubted. In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence. Of necessity, the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic.' (Board v. Seber, 318 US 705, 715)

"And the court in that case, following earlier decisions along the same line, held that 'the grant of citizenship to the Indians is not inconsistent with their status as wards whose property is subject to the plenary control of the federal government.' (p. 718) The contemplated surrender of that control created the problem which prompted the appointment of this committee.

## "4. Termination of Federal control

"While Congress may not abdicate its constitutional power 'to regulate commerce * * * with the Indian tribes' (Art I, sec. 8), it is settled that Congress may terminate the guardianship of the United States over the individual Indian and completely emancipate him from all Federal control not exercised over other citizens. For some fifty years, Congress has been moving gradually toward that end, dealing separately with particular tribes, one at a time.

"In 1954, Congress passed four separate acts relating to Indians of four separate tribes. One act dealt with the Menominee Tribe in Wisconsin (68 Stat. 250), another with the Ute Tribe in Utah (68 Stat. 868), a third with the Klamath Tribe in Oregon (68 Stat. 718), and the fourth with the Western Oregon tribes (68 Stat. 724). And there are now pending before the 84th Congress bills for similar acts relating to the Wyandotte Tribe (S. 3970), the Peoria Tribe (S. 3968 and H.R. 11672), and the Ottowa Tribe (S. 3969 and H.R. 11670).

"In substance, the 1954 Acts and the pending bills follow the same general pattern. Therefore, specific reference will be made only to the act relating to the Klamath Indians. It stated that its purpose was to terminate 'Federal supervision over the trust and restricted property of the Klamath Tribe of Indians' and to terminate 'Federal services furnished such Indians because of their status as Indians.' The body of the act, which is too long even to summarize here, sets forth the various steps to be taken to accomplish that purpose.

"The provisions with which we are presently concerned (1) give to each member of the tribe the right to elect 'to withdraw from the tribe and have his interest in tribal property converted into money and paid to him, or to remain in the tribe and participate in the tribal management plan' outlined in the act, (2) direct the Secretary of the In-

terior, when the termination plain [sic] is completed, to issue a 'proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has been terminated,' and (3) declare that thereafter 'all statutes of the United States which affect the Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several states shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.' The act declared the intention of Congress to accomplish the complete termination of Federal control 'at the earliest practicable time and in no event later than four years from the date of the act.' "