STURDEVANT, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–889–CR. Argued February 2, 1977.—Decided March 1, 1977.*
(Also reported in 251 N. W. 2d 50.)

For the plaintiff in error the cause was argued by *Mark Lukoff*, assistant state public defender, with whom on the brief was *Howard B. Eisenberg*, state public defender.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

CONNOR T. HANSEN, J. The issue in this case is not whether the defendant committed the offense charged, but rather it is whether the State of Wisconsin has jurisdiction to try a Menominee Indian for an offense committed outside the boundaries of the Menominee Reservation, but within the boundaries of the state.

The fact that the defendant is an enrolled member of the Menominee Tribe is undisputed. This case does

not involve the question of this state's jurisdiction over crimes alleged to have been committed by a Menominee Indian on the Menominee Reservation or in "Indian country" as that term is defined by federal statute. 18 U.S. Code, sec. 1151. Both the state and the defendant, by the posture of their arguments, agree that the locus of the offense, while within the boundaries of the state, was without the boundaries of the reservation and was not in "Indian country."

The defendant's assertion is that the courts of this state lack criminal jurisdiction over enrolled members of the Menominee Tribe for crimes committed off of the Menominee Reservation because neither the Menominee Tribe nor Congress has granted such power to the state. He relies principally upon the provisions of three treaties between the Menominee Tribe and the United States government. Those provisions are as follows:

TREATY of March 30, 1817, 7 Stat. 153.

"ART. 5. The undersigned chiefs and warriors as aforesaid, for themselves and those they represent, do hereby acknowledge themselves to be under the protection of the United States, and of no other nation, power, or sovereign, whatsoever."

TREATY of February 8, 1831, 7 Stat. 342.

"SIXTH . . . The chiefs and warriors of the Menomonee [Menominee] nation, acting under the authority and on behalf of their tribe, solemnly pledge themselves to preserve peace and harmony between their people and the Government of the United States forever. They neither acknowledge the power nor protection of any other State or people. . . ."

TREATY of February 11, 1856, 11 Stat. 679.

"ARTICLE 3. To promote the welfare and the improvement of the said Menomonees, and friendly rela-

tions between them and the citizens of the United States, it is further stipulated—

"1. That in case this agreement and the treaties made previously with the Menomonees should prove insufficient, from causes which cannot now been [be] foreseen, to effect the said objects, the President of the United States may, by and with the advice and consent of the Senate, adopt such policy in the management of the affairs of the Menomonees as in his judgment may be most beneficial to them; or Congress may, hereafter, make such provisions by law as experience shall prove to be necessary."

The defendant would read the above cited treaty provisions as constituting a grant of criminal subject matter jurisdiction over the Menominees to the federal government to the exclusion of all other governmental powers including states. In so doing he relies upon the proposition that Indian treaty provisions are supreme over state law and upon general rules concerning the construction of treaties as laid down by the United States Supreme Court in over a century of cases involving the interpretation of various Indian treaties. The defendant concludes that ". . . [u]ntil Congress does grant the State jurisdiction over the Menominee, it cannot act; until the Menominee Indians see fit to grant that power to the State, it cannot act."

[1]

As a general proposition, this court has concluded that Indians committing crimes violating state law off of the reservation and not in "Indian country" are subject to state criminal subject matter jurisdiction.[1] *State*

---

[1] This statement is made with reference only to state penal statutes not including fish and wildlife conservation laws. Indian hunting and fishing rights on and off the reservation have been a source of controversy in this state for quite some time. *See:* *State v. Gurnoe*, 53 Wis.2d 390, 192 N.W.2d 892 (1972); *State v. Sanapaw*, 21 Wis.2d 377, 124 N.W.2d 41 (1963); *State v. Johnson*, 212 Wis. 301, 249 N.W. 284 (1933); *State v. Morrin*, 136 Wis. 552, 117 N.W. 1006 (1908); *Menominee Tribe v. United*

*v. Tucker,* 237 Wis. 310, 296 N.W. 645 (1941) ; *State v. La Barge,* 234 Wis. 449, 291 N.W. 299 (1940) ; *State v. Johnson, supra.* In *State v. Johnson, supra,* 309, this court stated:

"The jurisdiction of a state to try in its courts an Indian charged with an offense commited outside of territory of the United States, even though the offender be a ward of the federal government, has never been seriously questioned. Such jurisdiction apparently has never been denied by any statute of the United States or by the federal courts. If such jurisdiction were denied by a federal statute, such statute would probably have to be held unconstitutional as an infringement upon the sovereignty of the states. . . .

"We think the correct rule, supported by sound reason and the weight of authority, is that the state courts have jurisdiction to try Indians for offenses committed upon fully patented lands even though such lands are located within the exterior boundaries of an Indian reservation; that when the lands are fully patented by the United States they cease to be territory of the United States and become subject to the jurisdiction of the state and its laws. . . ."

The United States Supreme Court, in several cases, has reached the same conclusion. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 Sup. Ct. 1267, 36 L. Ed.2d 114 (1973) ; *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 88 Sup. Ct. 1725, 20 L. Ed.2d 689 (1968) ; *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 Sup. Ct. 562, 7 L. Ed.2d 573 (1962) ; *Tulee v. Washington,* 315 U.S. 681, 62 Sup. Ct. 862, 86 L. Ed. 1115 (1942) ; *Shaw v. Gibson-Zahniser Oil Corp.,* 276 U.S. 575, 48 Sup. Ct. 333, 72 L. Ed. 709 (1928) ; *New York ex rel. Kennedy v. Becker,* 241 U.S. 556, 36 Sup. Ct. 705, 60 L. Ed. 1166 (1916) ; *Ward v. Race Horse,* 163 U.S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244 (1896). In

*States,* 391 U.S. 404, 88 Sup. Ct. 1705, 20 L.Ed.2d 697 (1968), and 1975 Wis. Law Review 1221.

*Mescalero Apache Tribe, supra,* 148, 149, the United States Supreme Court stated:

"But tribal activities conducted outside the reservation present different considerations. 'State authority over Indians is yet more extensive over activities . . . not on any reservation.' *Organized Village of Kake, supra,* at 75, 7 L Ed2d 573. Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State. . . ."

Several state courts have decided the issue in accord with the above cited authorities. *See: Anderson v. Britton,* 212 Ore. 1, 318 Pac.2d 291 (1957); *State v. Youpee,* 103 Mont. 86, 61 Pac.2d 832 (1936); *State v. Phelps,* 93 Mont. 277, 19 Pac.2d 319 (1933); *State v. Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026 (1899); *State ex rel. Best v. Superior Court,* 107 Wash. 238, 181 Pac. 688 (1919); *State v. Tilden,* 27 Idaho 262, 147 Pac. 1056 (1915); *Ex Parte Moore,* 28 S.D. 339, 133 N.W. 817 (1911); *State v. Buckaroo Jack,* 30 Nev. 325, 96 Pac. 497 (1908); *Pablo v. People,* 23 Colo. 134, 46 Pac. 636 (1896); *Hunt v. State,* 4 Kan. 60 (1866).

In a leading Indian law text, *Handbook of Federal Indian Law* (1945 ed.) by Felix S. Cohen, it is stated at p. 119:

"It is undoubtedly true, as a general rule, that an Indian who is 'off the reservation' is subject to the laws of the state or territory in which he finds himself, to the same extent that a non-Indian citizen or alien would be subject to those laws."

*See also:* 24 Minn. Law. Rev. 145, 153 (1940); 39 Yale Law. J. 307, 310 (1930); 42 C.J.S., *Indians,* sec. 79(2), pp. 798, 799; and 41 Am. Jur.2d, *Indians,* sec. 67, p. 870.

This court and the above cited authorities generally have reached the conclusion that a state has jurisdiction

to try an Indian for an offense committed outside of the reservation boundaries but within the state, without resort to an interpretation of the various treaties existing between the federal government and the Indian tribe in question. Such a procedure flows from the concept of state sovereignty and resort to treaty interpretation under these circumstances is unnecessary.

As expressed in chapter 1, Wisconsin Statutes, sec. 1.01, the State of Wisconsin has sovereignty over all lands located within its exterior boundaries.[2] This sovereignty is subject only to the limiting authority of the United States government as expressed in the United States Constitution. *Ableman v. Booth,* 62 U.S. 506, 21 How. 506, 16 L. Ed. 169 (1858). It arose upon the admission of the territory of Wisconsin to statehood in 1848, and resulted from the transfer of federal government sovereignty to the state. Black's Law Dictionary (4th ed.) defines sovereignty in part as:

"The power to do everything in a state without accountability,—to make laws, to execute and to apply them, . . ."

Since statehood, Wisconsin has exercised as one of the attributes of its sovereignty, civil and criminal jurisdiction over all lands within its boundaries with the exceptions noted in sec. 1.01, Stats.

That civil and criminal jurisdiction, although an inherent attribute of sovereignty is also expressed in constitutional and statutory provisions. Art. VII, sec. 8 of the Wisconsin Constitution states:

---

[2] *"1.01 State sovereignty and jurisdiction.* The sovereignty and jurisdiction of this state extend to all places within the boundaries thereof as declared in the constitution, subject only to such rights of jurisdiction as have been or shall be acquired by the United States over any places therein; and the governor, and all subordinate officers of the state, shall maintain and defend its sovereignty and jurisdiction. . . ."

". . . The circuit courts shall have original jurisdiction in all matters civil and criminal within this state, not excepted in this constitution, and not hereafter prohibited by law; . . ."

Sec. 252.03, Stats., describes the jurisdiction of a circuit court in part, as follows:

". . . The circuit courts . . . have power to hear and determine, within their respective circuits, all civil and criminal actions and proceedings unless exclusive jurisdiction is given to some other court; . . ."

Jurisdiction of the state over crime is expressly provided for in sec. 939.03, Stats.:

"*939.03  Jurisdiction of state over crime.*
"(1) A person is subject to prosecution and punishment under the law of this state if:
"(a) He commits a crime, any of the constituent elements of which takes place in this state; or
". . .
"(2) In this section 'state' includes area within the boundaries of the state, and area over which the state exercises concurrent jurisdiction under Article IX, section 1, Wisconsin constitution."

This is not a case where the crime was committed on a reservation or in "Indian country" and thus the jurisdiction of the federal government over internal Indian affairs might be called into question. *See, for instance, State ex rel. Pyatskowit v. Montour,* 72 Wis.2d 277, 240 N.W.2d 186 (1976); *State v. Rufus,* 205 Wis. 317, 237 N.W. 67 (1931); and *Mescalero Apache Tribe, supra.* The provisions of Public Law 280 (18 U.S. Code, sec. 1162), the Menominee Termination Act (25 U.S. Code, secs. 891–902), and the Menominee Restoration Act (25 U.S. Code, sec. 903 *et seq.*), have no applicability. Whatever sovereign power the federal government had to try Indians for crimes committed off of the reservation and on land ceded to the federal government by

treaty was transferred to the state upon its admission to the Union.

The defendant was convicted of the crime of aiding and abetting burglary contrary to secs. 943.10(1)(a) and 939.05, Stats. The crime occurred on land admittedly not on the reservation and not in "Indian country." Exclusive jurisdiction has not been granted to any other court. The concept of state sovereignty, the Wisconsin Constitution and the relevant Wisconsin statutes provide that the circuit court had such power or authority to hear and determine the charges brought against the defendant. In this case the circuit court had both subject matter and personal jurisdiction.

The defendant maintains that regardless of the state constitution and laws, the applicable treaty provisions prohibit the state from acting here. Whatever the implications of the treaty provisions; whatever the powers granted by them to the federal government; those powers, insofar as they are applicable to land ceded by the federal government to the state, were transferred to the state upon its admission to statehood.

If it were to be assumed that the cited treaty provisions did grant exclusive jurisdiction to the federal government to try Indians on land ceded by the Indians to the federal government, then that jurisdiction was transferred to the state by the Enabling Acts admitting it to statehood.[3] If that transfer of jurisdiction over lands not comprising those left to the Indians, constitutes an abrogation of any treaty right, *i.e.*, the right to be tried by federal authorities, such abrogation was well within the power of Congress.

While the defendant argues that Congress has never granted jurisdiction to the states to try Indians for

---

[3] Enabling Act of 1846, 9 Stat. 56; R.S. 1858 Appendix p. 1081. Act admitting Wisconsin to the Union, 9 Stat. 233; R.S. 1858 Appendix p. 1084.

criminal offenses occurring off the reservation, we are of the opinion the State Enabling Act accomplished just that grant of jurisdiction. Thus, if the treaty provisions granted jurisdiction to the federal government, that jurisdiction has been delegated to the state.

It is possible to conceive the argument of the defendant to be that the treaty provisions specifically prohibit the state from assuming criminal subject matter jurisdiction over Menominee Indians for crimes committed within the state boundaries but without the area of land left to, or subsequently given to, the Indians. That is, in recognizing the power and protection of the federal government, the Menominee Indians specifically refused to recognize the power of the state. (*See, for instance, McDonald v. State,* 80 Wis. 407, 50 N.W. 185 (1891).)

We believe this argument is well disposed of by a holding in *State v. Youpee, supra,* 91, which we cite with approval:

"It may be taken as settled beyond controversy that, where a crime is committed within the boundaries of a state, the state courts have exclusive jurisdiction to try the defendant, unless some specific federal law vests jurisdiction in the federal courts. These specific laws, to be controlling here, must be found in the Federal Constitution, the acts of Congress, our Enabling Act or treaties between the United States and the tribe of Indians to which the defendant belongs. . . ."

Even under the rules governing treaty interpretations cited by the defendant in his brief, the plain language of the cited treaty provisions does not reasonably lead to the conclusion that the parties intended to deprive the then nonexistent State of Wisconsin of the jurisdiction to try Menominee Indians for criminal offenses committed within its boundaries and outside of the Menominee Reservation.

The decision of the trial court in denying the defendant's postconviction motion correctly and succinctly states:

"The real issue is whether a treaty provision placing the Menominee people under the protection of the United States and no other nation, power or soverign [sic], means they are not amenable to the process of laws enacted by the State of Wisconsin for offenses committed in the State of Wisconsin. It seems clear that the provision in the Treaties was designed to cloak the Menominees in the protection of the United States Government rather than the foreign powers who were attempting to assert a claim to lands now part of the territorial boundaries of the United States. Does the phrase 'protection of the United States' mean that the United States Government has exclusive jurisdiction over the members of the Menominee Nation or does that phrase mean simply that all members of the Menominee Nation are entitled to the rights and privileges enjoyed by citizens of this county? [sic] Surely, the Constitution cloaks all citizens of this country under the protection of the United States Government but it cannot be argued that such protection precludes the exercise of State jurisdiction over such citizens.

"The same interpretation is necessary as to the phrase providing the Menominees 'neither acknowledge the power nor protection of any other State or people'. Is such a provision meant to deprive the State of Wisconsin the jurisdiction over members of the Menominee Nation? Is their acknowledgment of power or protection of the State of Wisconsin necessary to jurisdiction and further, is such a provision a covenant between the Government of the United States and the Menominee Indian Nation that compels Federal jurisdiction over Menominees, irrespective of where the conduct occurs? A plain reading of this language cannot compel the conclusion that any of the treaties in question were intended to vest jurisdiction in the Federal Government and the Federal Government alone, which power could not in any circumstance be delegated to the States. To reach such a conclusion, one must go far beyond words which appear in the Treaties but conclude that it was the intent of Congress

and the Menominee Tribe to make such a provision. A history of the exercise of state jurisdiction over members of the Menominee Nation, the resolution of this question as it relates to the question of jurisdiction are all inconsistent with the conclusion that such an intention existed at the time the Treaties were executed."

Although legal ambiguities in treaties are to be resolved in favor of the Indians (*State v. Gurnoe, supra,* 403; *State v. Sanapaw, supra,* 382; *McClanahan v. Arizona Tax Commission,* 411 U.S. 164, 93 Sup. Ct. 1257, 36 L. Ed.2d 129 (1973); *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 Sup. Ct. 121, 74 L Ed. 478 (1930); *Winters v. United States,* 207 U.S. 564, 576, 28 Sup. Ct. 207, 52 L. Ed. 340 (1908)) the rule of construction is not a license to create nonexistent treaty provisions. *DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 Sup. Ct. 1082, 43 L. Ed.2d 300 (1975). The treaty provisions neither grant exclusive criminal jurisdiction to the federal government nor prohibit its exercise by the State of Wisconsin.

Since the cited treaty provisions do not prohibit the state from exercising criminal subject matter jurisdiction in the circumstances presented by this case; since the federal government has not retained exclusive jurisdiction in these circumstances but rather has delegated its sovereignty to the state; and since the state constitution and the statutes specifically provide for the state assumption of criminal jurisdiction, the defendant's position on this appeal cannot be maintained.

*By the Court.*—Judgment and order affirmed.