139 F.Supp. 634 (1956)
KLAMATH & MODOC TRIBES and YAHOOSKIN BAND OF SNAKE INDIANS OF THE KLAMATH RESERVATION in the State of Oregon, Seldon E. Kirk, Dibbon Cook, Delford Lang, Wernie Foster, Dice Crane, J. L. Kirk, Elnathan Davis, Boyd J. Jackson, Joe Miller, Jr.,each on its or his own behalf and as representative of the Indians of the Klamath Reservation, Oregon, Plaintiffs,
v.
H. G. MAISON, individually and as Superintendent, Department of State Police, State of Oregon; J. H. Van Winkle, Chairman, Delbert Gildersleeve, Donald Mitchell, Kenneth G. Denman, and Elmer H. Balsiger,each individually and as a member of the State Game Commission of the State of Oregon, Robert Y. Thornton, individually and as Attorney General of the State of Oregon, Defendants.
The United States of America, Intervener.
Civ. A. No. 8081.
United States District Court D. Oregon.
March 13, 1956.
*635 Mr. J. C. O'Neill, Klamath Falls, Or., and John W. Cragun (of Wilkinson, Boyden, Cragun & Barker), Washington, D. C., for plaintiffs.
Charles F. Luce, Walla Walla, Wash., for Confederated Tribes of Umatilla Indian Reservation.
Arthur G. Higgs and John D. Nichols, Asst. Atty. Gen., for State of Oregon.
C. E. Luckey, U. S. Atty., Portland, Or., for the United States.
SOLOMON, District Judge.
The Court makes the following

Findings of Fact
1. Plaintiff Klamath & Modoc Tribes and Yahooskin Band of Snake Indians (hereinafter referred to as the "Klamath Tribe") is a recognized tribe or community of Indians organized under a constitution and by-laws approved by the Secretary of the Interior, and maintaining a tribal government and the ownership of tribal property in connection with the Klamath Reservation in the State of Oregon. Plaintiff Klamath Tribe entered into a treaty with the United States of America on October 14, 1864, 16 Stat. 707, hereinafter referred to as the "Treaty of 1864". The Klamath Tribe brought this suit on its own behalf as the owner of the hunting and trapping rights, privileges or immunities within the area of its aboriginal domain reserved to it by the Treaty of 1864, and as representative of its members who, in accordance with tribal law and custom have always exercised rights to hunt and trap within the said reserved area, herein referred to as the "reservation" or "Klamath Reservation".
2. In addition to the Klamath Tribe, nine individual members of the Tribe join as plaintiffs. Each is a member of the Executive Committee of the Klamath Tribe; and each owns or has exercised the right, privilege or immunity to hunt or trap on the Klamath Reservation pursuant to rights of the Tribe or its members referred to in Findings 5 to 9 and each sued on his own behalf and as representative of other members of the Klamath Tribe similarly situated. There are enrolled more than 1,800 members of the Klamath Tribe, each of whom has or asserts rights identical with those of the individual plaintiffs.
3. Defendants are officials or employees of the State of Oregon as follows: H. G. Maison is Superintendent, Department of State Police of the State of Oregon; J. H. Van Winkle is a member and is chairman and Delbert Gildersleeve, Donald Mitchell, Kenneth G. Denman and Elmer H. Balsiger are members of the State Game Commission; and Robert Y. Thornton is Attorney General.
4. At and long prior to the coming of the white man to their country, the aboriginal groups which compose the Klamath Tribe owned or occupied exclusively a vast domain of land in what are now the States of California and Oregon. There they exploited their domain in the manner of their culture, which was primarily a hunting, trapping, fishing and gathering culture. They derived an essential part of their livelihood from hunting and trapping, which they conducted at all seasons of the year without restriction other than that of their own needs and that imposed by their own tribal law or customs. The domain thus aboriginally owned, occupied and exploited *636 included all the land later included within the Klamath Reservation.
5. By Article I of the Treaty of 1864 referred to in Finding 1, following the description of lands ceded, it is provided 
"That the following described tract, within the country ceded by this treaty, shall, until otherwise directed by the President of the United States, be set apart as a residence for said Indians, [and] held and regarded as an Indian reservation, to wit: Beginning upon the eastern shore of the middle Klamath lake, at the Point of Rocks, about twelve miles below the mouth of Williamson's river; thence following up said eastern shore to the mouth of Wood river; thence up Wood river to a point one mile north of the bridge at Forth Klamath; thence due east to the summit of the ridge which divides the upper and middle Klamath lakes; thence along said ridge to a point due east of the north end of the upper lake; thence due east, passing the said north end of the upper lake, to the summit of the mountains on the east side of the lake; thence along said mountain to the point where Sprague's river is intersected by the Ish-tish-ea-wax Creek; thence in a southerly direction to the summit of the mountain, the extremity of which forms the Point of Rocks; thence along said mountain to the place of beginning. And the tribes aforesaid agree and bind themselves that, immediately after the ratification of this treaty, they will remove to said reservation and remain thereon, unless temporary leave of absence be granted to them by the superintendent or agent having charge of the tribes.
"It is further stipulated and agreed that no white person shall be permitted to locate or remain upon the reservation, except the Indian superintendent and agent, employes of the Indian department, and officers of the army of the United States, and that in case persons other than those specified are found upon the reservation, they shall be immediately expelled therefrom; and the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits, is hereby secured to the Indians aforesaid: Provided, also, That the right of way for public roads and railroads across said reservation is reserved to citizens of the United States."
6. Since ratification of the treaty between the United States and Plaintiff Klamath Tribe of October 14, 1864, 16 Stat. 707, the Klamath Tribe has resided within the district of country set forth in Article I of the said treaty.
7. In aboriginal times up to the coming of the white man and throughout the period of recorded history, including the period following the Treaty of 1864, plaintiff tribes hunted and trapped throughout the area set aside in such treaty without restriction. They hunted and ate grizzly bear, brown bear, deer, elk, antelope, beaver, racoon, badger and the Modoc also hunted and ate fox, coyote, wolf, puma, wildcat, skunk, porcupine, rabbit, groundhog and gopher. The Klamath Tribe also hunted coyotes, grey-wolves, foxes, badgers, wildcats, rabbits and various fur-bearing animals which furnished blankets and clothing, and swans, geese, ducks and wading birds, the majority of which were used by the tribes as food in various ways, the skins of swans, geese, and other birds with especially fine down being made into feather blankets, swaddling clothes, etc.
8. Plaintiffs are known to have had a large number of methods of hunting, including driving game into the water or mud, or surrounding it by fire; they trapped game by nooses above the trail (including deer and other large game), and as to birds by nooses held on a stick or suspended from a cord. They netted game, and captured deer and other game in pitfalls; they hunted from booths and blinds and from brush fences or enclosures, *637 and ambushed game from pits and from dugouts run into tules. In hunting they disguised themselves by wearing animal heads and entire skins; they used flares or jacklights to attract waterfowl; they imitated cries of the game, including imitating the cries of a fawn; and they smoked bears out of their dens.
9. Hunting and trapping on the reservation is still practiced by the tribe and its members and affords a substantial part of the subsistence and livelihood of the Klamath people. Many would be inadequately fed were they deprived of the right to hunt on their reservation as their needs for food require.
10. The state officials who are defendants never asserted any right to limit the hunting exercised by the tribesmen on the reservation until after the enactment of Public Law 280, 83d Cong., 67 Stat. 588, August 15, 1953. Following its adoption, they have threatened repeatedly to arrest members of the tribe and confiscate their guns, sights, traps and other equipment because such members hunt out of season or possess out-of-season game killed within season and held on the reservation, or fail in other respects to conform with the Oregon laws respecting season, species, baglimits or sex.
From these Findings of Fact the court makes the following

Conclusions of Law
1. The Klamath and Modoc Tribes and Yahooskin Band of Snake Indians of the Klamath Reservation in the State of Oregon and the members thereof have an exclusive right, privilege or immunity afforded them under the Treaty of October 14, 1864, 16 Stat. 707, between said tribe and the United States, to hunt and trap upon the Klamath Indian Reservation without restriction or control, except such restriction or control as they may impose upon themselves.
2. Public Law 280, 83d Cong., 67 Stat. 588, 18 U.S.C. § 1162, 28 U.S.C. § 1360, did not extend the hunting and trapping laws of the State of Oregon to the Klamath Indian Reservation.
3. It is unnecessary in this proceeding that the court pass upon the constitutionality of the said Public Law 280, 83d Cong., and the court makes no decision upon the constitutionality thereof.
4. It is not necessary at this time that the court grant any injunctive relief, but jurisdiction is reserved to grant such relief in an appropriate proceeding upon application by the plaintiffs and a proper showing of the necessity thereof.