James Quinten **ANDERSON**, Petitioner,

v.

**C. T. GLADDEN**, Warden, Oregon State Penitentiary, Respondent.

Civ. No. 60–33.

United States District Court
D. Oregon.

Oct. 13, 1960.

Edward L. Clark, Jr., Salem, Or., Philip A. Levin, Portland, Or., for petitioner.

Robert Y. Thornton, Atty. Gen., of Oregon, Robert G. Danielson, Asst. Atty. Gen., for respondents.

C. E. Luckey, U. S. Atty., Portland, Or., for intervenor.

KILKENNY, District Judge.

This cause is before the Court on petitioner's amended petition for a writ of habeas corpus and on respondent's motion to dismiss such amended petition.

Petitioner was found guilty of the crime of murder in the second degree by a jury verdict returned on the 25th day of February, 1955, in the Circuit Court of the State of Oregon for Harney County, on which verdict petitioner was sentenced to life imprisonment in the Oregon State Penitentiary on the 1st day of May, 1955. The victim was a white man.

Petitioner is of Indian blood and at all times was and is an enrolled member of the Klamath tribe of Indians and resided on the Klamath Indian Reservation in Klamath County, Oregon. The crime of which the petitioner was convicted was committed within the boundaries of said Indian Reservation.

Petitioner asserts that his imprisonment is in violation of his rights and privileges in the following particulars:

A. The government of the United States has exclusive jurisdiction over crimes committed by Indians within Indian country.

B. Congress could not legally delegate jurisdiction over crimes committed by Indians within Indian country to the state of Oregon.

C. The state of Oregon could not legally exercise jurisdiction over crimes committed by Indians within Indian country.

D. The state of Oregon failed to take any steps to accept the jurisdiction purportedly conferred upon it by Congress over crimes committed by Indians within Indian country.

E. In any event, Congress could not legally delegate and the state of Oregon could not properly accept jurisdiction over such crimes until the termination of the Klamath Indian Reservation had taken place.

Petitioner charges that his other remedies have been exhausted by reason of the following:

1. His appeal from his original judgment of conviction to the Supreme Court of the State of Oregon and the affirmation by that Court of his conviction. State v. Anderson, 207 Or. 675, 298 P.2d 195, 60 A.L.R.2d 850.

2. His filing on June 13, 1956, of a petition for writ of habeas corpus against the Sheriff of Klamath County, Oregon, in which proceeding relief was denied by judgment entered on or about July 10, 1956.

3. His appeal from said judgment denying relief to the Supreme Court of the State of Oregon, which judgment was affirmed by said Court on November 13, 1957. Anderson v. Britton, 212 Or. 1, 318 P.2d 291.

4. His petition for writ of certiorari to the Supreme Court of the United States to review the said decision of the Oregon Supreme Court, which petition was denied on May 19, 1958 (356 U.S. 962, 78 S.Ct. 999, 2 L.Ed.2d 1068).

■■ I hold that petitioner has exhausted his remedies in the state court. The denial of the writ of certiorari by the United States Supreme Court is of no significance on the merits of this case. Brown v. Allen, 1953, 344 U.S. 443, 448–497, 73 S.Ct. 397, 437, 97 L.Ed. 469; Graeber v. Rhay, 9 Cir., 1958, 256 F.2d 556.

The matters asserted in said habeas corpus proceedings before the Oregon courts were identical with the matters herein set forth in petitioner's amended petition. In my judgment the exhaustive and scholarly opinion of Justice Kester in Anderson v. Britton, supra, quite adequately disposes of petitioner's contentions, and under ordinary circumstances, I would be inclined to adopt that opinion as my own. However, petitioner has challenged the rationale of said opinion in many particulars and I feel he is entitled to this court's opinion on those subjects. A complete factual background may be obtained from State v. Anderson, supra, and Anderson v. Britton, supra.

Petitioner's contentions as set forth in his petition are reduced in his brief to two questions of law:

1. (a) Can Congress, while the Klamath Indian Reservation continues in existence, legally delegate jurisdiction to the state of Oregon over crimes committed by Indians within that jurisdiction.

(b) Is Congress barred by the Klamath Indian treaty from delegating jurisdiction to the state of Oregon before termination of the Klamath Reservation pursuant to the provisions of 25 U.S.C.A. §§ 564–564x.

2. Assuming, *arguendo*, that Congress may legally delegate jurisdiction to the state of Oregon while the Reservation is in existence, is such a delegation self-executing, or does it require an affirmative acceptance by the state of Oregon.

The problem cannot be solved without recourse to the source of the power of the federal government.

■■ The federal union has only those powers expressly conferred on it and those reasonably implied from powers granted, while each state has all governmental powers except such as the people, by the Constitution, have conferred on the United States, denied to the state or reserved to themselves. United States v. Butler, 297 U.S. 1, 56 S. Ct. 312, 80 L.Ed. 477; Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603; Knapp v. Schweitzer, 357 U.S. 371, 78 S. Ct. 1302, 2 L.Ed.2d 1393. The power reserved to the states under the Consti-

tution to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity with the provisions of the Constitution. Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248; Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226; Romero v. International Terminal Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368. In the state of Oregon the common law of England was adopted as it existed, modified and amended by the English statutes passed prior to the Revolution. Peery v. Fletcher, 93 Or. 43, 182 P. 143; United States Fidelity & Guaranty Co. v. Bramwell, 108 Or. 261, 217 P. 332, 32 A.L.R. 829; State v. Black, 193 Or. 295, 236 P.2d 326. Murder was a crime at common law. 1 Wharton, Criminal Law, 12th ed., p. 624, § 418. There are no common-law crimes against the United States. Donnelley v. United States, 276 U.S. 505, 511, 48 S.Ct. 400, 72 L.Ed. 676; United States v. Eaton, 144 U.S. 677, 12 S.Ct. 764, 36 L.Ed. 591.

■ When the Colonies achieved their independence, each one took the prerogatives which had belonged to the Crown and when the national Constitution was adopted, certain of those prerogatives were imparted to the new government as an incidence of the sovereignty thus created. United States v. Thompson, 98 U.S. 486, 25 L.Ed. 194. The prerogatives of the Crown, which devolved upon the people of the states when the states declared their independence, remained with them, except insofar as they have delegated a portion thereof to the federal government. The state, as the sovereign, is in parens patriae. Fontain v. Ravenel, 17 How. 369, 58 U.S. 369, 15 L.Ed. 80. The successful termination of the War of Independence placed on the people of the thirteen original states the duties as well as the powers which formerly vested in the British Crown. Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629. Such powers and duties were in the people of the individual states from the Declaration of Independence to the enactment of the Constitution. McIlvaine v. Coxe's Lessee, 4 Cranch 209, 8 U.S. 209, 2 L.Ed. 598.

■ Even if the Provisional government of Oregon was "de facto" only, it was clothed, while it existed, with the same rights, duties and powers as a government "de jure." Lehigh Valley R. Co. v. State of Russia, 2 Cir., 1927, 21 F. 2d 396, certiorari denied 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432; Thorington v. Smith, 8 Wall. 1, 75 U.S. 1, 19 L.Ed. 361. The jurisdiction of a nation (Oregon) within its own territory is exclusive and absolute and is susceptible to no limitation not imposed by itself. The Exchange, 7 Cranch 116, 11 U.S. 116, 3 L. Ed. 287; Church v. Hubbart, 2 Cranch 187, 6 U.S. 187, 2 L.Ed. 249. Therefore, the jurisdiction of the courts of the Provisional government of Oregon was exclusive and absolute until that government was succeeded by the government of the Territory of Oregon and the government of the United States.

■ From the foregoing it is clear that whatever power the Congress has over Indians must be found in the Constitution and those powers must be originally derived from the states.

Prior to June 30, 1834, crimes committed by Indians against white persons and by white persons against Indians were specifically enumerated and defined and those by Indians against each other were left to be dealt with by each tribe for itself according to its local customs. Act of May 19, 1796 (1 Stat. 469, c. 30); Act of March 30, 1802 (2 Stat. 139, c. 13). On June 30, 1834, the Congress enacted what is commonly known as the Indian Intercourse Act (4 Stat. 729, 733, c. 161). The provisions now contained, with slight modifications, in 25 U.S.C.A. §§ 217 and 218, were contained in § 25 of said Indian Intercourse Act. These sections read:

§ 217. "Except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United

States, except the District of Columbia, shall extend to the Indian country."

§ 218. "The preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

Legislation similar to the foregoing was enacted by Congress on February 18, 1875 (18 Stat. 318), now 18 U.S.C.A. § 1152. Both laws exclude crimes committed by one Indian against the person or property of another Indian and any Indian committing an offense in the Indian country who has been punished by the local law of the tribe and such cases which, by treaty, were secured to the exclusive jurisdiction of the Indian tribes. It was not until March 3, 1885 (23 Stat. 385), now 18 U.S.C.A. § 1153, that the Congress extended the jurisdiction of federal courts to crimes committed by one Indian against the person or property of another Indian, originally as to seven major crimes, now increased to eleven. It is significant that as early as 1796 the Congress was legislating with reference to crimes committed by Indians against white persons and white persons against Indians. Even at that early date no one seemed to challenge the federal government's right and power under the Constitution to control and prosecute crimes by Indians with the sole exception of a crime by one Indian against another. Of course, this power must have been derived from the thirteen original states through the Constitution. Originally, this power must have been lodged in the states and, as a complete and independent sovereign prior to the adoption of the Constitution, each state must necessarily have had the right to make its criminal code apply to Indians. When each original state adopted the Constitution, it surrendered such right, to the extent of the use of that right by Congress.

Chief Justice Marshall, in one of his brilliant opinions, clearly outlines the source of federal power over Indians and Indian country in Worcester v. State of Georgia, 6 Pet. 515, 557, 8 L.Ed. 483. There, after tracing the original power to the crown of England, he finds the same lodged in the confederation of states, and says:

"Such was the state of things when the confederation was adopted. That instrument surrendered the powers of peace and war to congress, and prohibited them to the states, respectively, unless a state be actually invaded, 'or shall have received certain advice of a resolution being formed by some nation of Indians to invade such state, and the danger is so imminent as not to admit of delay till the United States in congress assembled can be consulted.' *This instrument also gave the United States in congress assembled the sole and exclusive right of* 'regulating the trade and managing all the affairs with the Indians, not. members of any of the states; provided, that the legislative power of any state within its own limits be not infringed or violated.'

" * * * The correct exposition of this article is rendered unnecessary by the *adoption of our existing constitution. That instrument confers on congress* the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. *These powers comprehend all that is required for the regulation of our intercourse with the Indians.* They are not limited by any restrictions on their free actions; the shackles *imposed on this power, in the confederation, are discarded."*

This is a direct holding that the power of the federal government over Indians and Indian affairs is conferred on Con-

gress by the Constitution of the United States. The source of that power is the states.

The statement in United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 1114, 30 L.Ed. 228, that the power of the federal government over Indians must exist in the federal government "because it never has existed anywhere else", is, in my opinion, fundamentally unsound. In any event, the decision in Kagama must be limited to the factual situation before the court at that time. Bramwell v. United States Fidelity & Guaranty Co., 1926, 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368, affirming 9 Cir., 1924, 299 F. 705; In re Marathon Foundry & Machinery Co., 7 Cir., 1956, 239 F.2d 122; Metropolitan Casualty Co. of New York v. Colthurst, 9 Cir., 1930, 36 F.2d 559.

The crime involved in Kagama was the murder of an Indian by two other Indians on an Indian Reservation. It is clear that Congress had not invaded this particular field until the said Act of March 3, 1885, now 18 U.S.C.A. § 1153. Certainly, that language would not be appropriate where an Indian was charged with the murder of a white man, such as here.

The Preamble of the Organic Law of the Provisional government of Oregon, passed by the legislative committee of that group on July 5, 1845, and approved by the vote of the people prior to August 5, 1845, provided:

"We, the people of Oregon territory, for purposes of mutual protection, and to secure peace and prosperity among ourselves, agree to adopt the following laws and regulations, *until such time as the United States of America extend their jurisdiction over us*: * * *."

Article I, § 3 of this Organic Law contains the following provision with reference to Indians:

" * * * The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights and liberty, they shall never be invaded or disturbed, unless in just and lawful wars, authorized by the representatives of the people; but laws founded in justice and humanity, shall, from time to time, be made for preventing injustice being done to them, and for preserving peace and friendship with them."

Under the general grant of powers, § 6 of Article II provided, among other things:

" * * * to regulate the intercourse of the people with the Indian tribes * * * and all powers not hereby expressly delegated, remain with the people. * * *"

Article II, § 8 provided that the judicial power of the Provisional government be vested in a supreme court and others, with the criminal jurisdiction to be lodged in such supreme court.

The Provisional government of Oregon remained in existence until the Act of August 14, 1848 (9 Stat. 323), which established the Territorial government of Oregon. Section 17 of said Act continued in full force and effect all civil and criminal proceedings which were pending under the Provisional government of Oregon and in that manner the Congress of the United States actually recognized such Provisional government.

The Constitution of Oregon was approved by a vote of the people of the Oregon Territory on November 9, 1857. The act of Congress admitting Oregon into the Union, in which said Constitution is recognized, was approved on February 14, 1859 (11 Stat. 383). Section 4 of this Act offered certain propositions to the people of the state of Oregon for acceptance or rejection. The legislative assembly of the state of Oregon accepted these propositions by an Act approved June 3, 1859. It is significant that neither the Oregon Constitution nor the Act of Congress admitting Oregon into the Union made reference to Indians or Indian affairs. The area embraced within the confines of the state of Oregon was formerly Oregon Territory. That Territory was carved out of the former

Oregon Country which stretched from the Spanish possessions (California) on the south to the Russian possessions (Alaska) on the north.[a]

When the state of Oregon was admitted to the Union, it was admitted with all of the powers of sovereignty and jurisdiction which pertained to the *original states*. Donnelley v. United States, supra p. 271; United States v. McBratney, 104 U.S. 621, 26 L.Ed. 867; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419. The organization and admission of the states to the Union included in the power of such states the control of crimes committed by white people against whites in the Indian country, in the absence of some law or treaty to the contrary. Donnelley v. United States, supra; Draper v. United States, supra; United States v. McBratney, supra.

In the light of the facts in this case, it seems entirely immaterial whether I hold that the state of Oregon had residual powers over Indians and Indian territory by reason of an inherent power in the Provisional, Territorial and State governments, or by reason of retaining, on its admission to the Union, the same powers as were inherent to the thirteen original states, from whom all power with reference to Indians and Indian territory was lodged in the United States Constitution.

The Whitman Massacre occurred in Oregon Country under the Provisional government on the 29th day of November, 1847. When Oregon Territory was established by Act of Congress on August 14, 1848, it was assigned the prosecution of all criminal proceedings which were pending under the Provisional government.[1] The crimes committed by the Indians involved in said Massacre were committed against the said Provisional government. The Territorial government, an arm of the United States, was not created until after the commission of the crimes. Five of the Indians involved in said Massacre were indicted on the 21st day of May, 1850 in the "District Court of the United States for the District of Oregon."[2] Defendants attacked the sufficiency of the indictment on jurisdictional grounds.[3] The Indians were found guilty in said court by the verdict of a jury.[4] Although the judgment sentencing the Indians to death is not available in the original record, I have it on good authority that the Indians were executed at Oregon City, in Oregon Territory, on June 3, 1850, which would be nine years prior to the admission of Oregon to the Union. Carey, History of Oregon, Vol. II, pp. 543–544. This exercise of jurisdiction was long before the first treaty between the United States and any of the Indians in the Oregon Territory. The first such treaty was signed at Champoeg, Oregon, on April 19, 1851, between the Twality band of the Calapooya tribe and the United States. Carey, History of Oregon, Vol. II, p. 550.

The phrase, "Indian Country" as used in the Act of 1834 was a technical one and applied only to such portions of the United States as are described in the first section thereof or have since become such pursuant to an Act of Congress or treaty of the United States. Such phrase did not extend or apply to any country simply because it was owned or inhabited by Indians in whole or in part. It is clear that the Act of 1834 and subsequent legislation did not extend to the Oregon Country until June 5, 1850. United States v. Bridleman, D.C.Or., 7 F. 894. By express enactment of Congress on said date (9 Stat. 437) the Act of 1834 was extended to the Oregon Territory. By that Act the Congress declared "that the law regulating trade and intercourse with the Indian tribes east of the Rocky Mountains, or such provisions of the same as may be applicable, be extended over the Indian

---

a. Treaty of June 15, 1846, 9 Stat. 869, with Great Britain established northern boundary at 49°.

1. Page 672 of this opinion.

2. See Appendix A.

3. See Appendix B.

4. See Appendix C.

**674**

tribes in the Territory of Oregon." So, at the time of the formation of the Provisional government and until June 5, 1850, the federal legislation with reference to criminal jurisdiction over Indians was not applicable to the Oregon Country.

■ The courts of Oregon, Provisional, Territorial and State, have always had jurisdiction over the crime of murder committed within its boundaries, such jurisdiction being limited only by Congressional action in Indian affairs. When Congress withdrew from this field, the impediment to state jurisdiction was removed.

■ Petitioner was convicted of the violation of Oregon law,[5] not federal law. The state of Oregon, not the United States, created the court which tried petitioner and that court always had jurisdiction, except where that jurisdiction was limited by federal legislation. When the impediment was removed by Public Law 280, the jurisdiction of the Oregon courts was complete. An attempted acceptance of jurisdiction by the state of Oregon would be completely redundant. In re Rahrer, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572.

State v. Columbia George, 39 Or. 127, 65 P. 604, and Red Hawk v. Joines, 129 Or. 620, 278 P. 572, are in full accord. I hold that such residual powers existed.

Petitioner relies on the treaty of February 17, 1870 between the United States and the Klamaths and other tribes (16 Stat. 707). This treaty provided, among other things, as follows:

"It is further stipulated and agreed that no white person shall be permitted to locate or remain upon the reservation, except the Indian superintendent and agent, employés of the Indian department, and officers of the army of the United States, *guaranteed* [and] that in case persons other than those specified are found upon the reservation, they shall be immediately expelled

therefrom; and the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits, is hereby secured to the Indians aforesaid: Provided, also, That the right of way for public roads and railroads across said reservation is guaranteed [reserved] to the citizens of the United States. * * *

"The several tribes of Indians, parties to this treaty, acknowledge their dependence upon the government of the United States, and agree to be friendly with all citizens thereof, and to commit no depredations upon the person or property of said citizens, and to refrain from carrying on any war upon other Indian tribes; *and they further agree that they will not communicate with or assist any persons or nation hostile to the United States, and, further, that they will submit to and obey all laws and regulations which the United States may prescribe for their government and conduct.* * * * *"

In construing the language of this treaty we must keep in mind the federal laws then in existence with reference to Indians and Indian territory. At that time the provisions of 25 U.S.C.A. §§ 217 and 218, with slight modifications, were in full force and effect. Those laws gave exclusive jurisdiction to the United States over all crimes committed in any place within the sole and exclusive jurisdiction of the United States to the Indian Country, with the exception of crimes committed by one Indian against the person or property of another Indian, or by an Indian committing an offense in the Indian Country who had been punished by the local law of the tribe, or any case where, by treaty stipulation, the exclusive jurisdiction over such offense is or may be secured to the Indian tribes respectively. There is no claim here that the petitioner has been punished by any local law of the Klamath tribe, nor is

5. ORS 163.020.

there anything in the stipulation which would create exclusive jurisdiction over this crime in the Klamath tribe. On the other hand, the treaty affirmatively commits the members of the Klamath tribe to "obey all laws and regulations which the United States may prescribe for their government and conduct."

On August 15, 1953, Congress passed Public Law 280 (67 Stat. 588), [18 U.S. C.A. § 1162]. which provided, among other things, as follows:

§ 1162. "(a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
| --- | --- |
| Alaska ........ | All Indian country within the Territory. |
| California ..... | All Indian country within the State. |
| Minnesota ..... | All Indian country within the State, except the Red Lake Reservation. |
| Nebraska ..... | All Indian country within the State. |
| Oregon ....... | All Indian country within the State, except the Warm Springs Reservation. |
| Wisconsin ..... | All Indian country within the State. |

\*　\*　\*　\*　\*　\*

"(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section."

Section 6 of said Public Law 280 provided:

"Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act (adding section 1360 of this title and section 1162 of Title 18): Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be." [28 U.S.C.A. § 1360 note.]

Section 7 of said Public Law 280 provided:

"The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act (adding section 1360 of this title and section 1162 of Title 18), to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." [28 U.S.C.A. § 1360 note.]

Said law also conferred on the states jurisdiction over civil causes between Indians or to Indians who are parties to causes which would arise in the same areas of Indian country. The law contained certain saving clauses with respect to Indian property and with respect to treaty rights for hunting, trapping and fishing.

On August 13, 1954, Congress passed an Act which provided for the termina-

tion of federal supervision over the Klamath Indians. 25 U.S.C.A. § 564. This was a comprehensive and very thorough plan for the termination of said supervision. Petitioner invokes the provisions of §§ 564q and 564r, which provide:

§ 564q: "(a) Upon removal of Federal restrictions on the property of the tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and, except as otherwise provided in sections 564 to 564w–1 of this title, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

"(b) Nothing in sections 564 to 564w–1 of this title shall affect the status of the members of the tribe as citizens of the United States."

§ 564r: "Effective on the date of the proclamation provided for in section 564q of this title, all powers of the Secretary or other officer of the United States to take, review, or approve any action under the constitution and bylaws of the tribe are terminated. Any powers conferred upon the tribe by such constitution which are inconsistent with the provisions of sections 564 to 564w–1 of this title are terminated. Such termination shall not affect the power of the tribe to take any action under its constitution and bylaws that is consistent with said sections without the participation of the Secretary or other officer of the United States."

1. Petitioner has challenged the authority of Congress to return jurisdiction to the Oregon courts over crimes committed on the Klamath Indian Reservation while the Klamath Indian Reservation is in existence, until the termination of the Klamath Indian Reservation pursuant to the provisions of 25 U.S.C.A. I am of the opinion that Public Law 280 supersedes all previous laws on the subject and that if said Law is in conflict with the provisions of the treaty with the Klamath Indians of 1870, the provisions of the Law must prevail over the stipulations of the treaty. The plenary power of Congress over the tribal relations and lands of Indians cannot be limited by treaty. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L. Ed. 299; Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740. This plenary power over Indian tribes and tribal properties cannot be limited by treaties to the extent of preventing repeal or amendment of such treaties by a later statute. Nicodemus v. Washington Water Power Co., 9 Cir., 1959, 264 F.2d 614. Respondent argues that Indian tribes retained substantial criminal jurisdiction. The Klamath tribe may have had that jurisdiction until Congress invaded the field. The above decisions and Kagama would uphold the power of Congress to pass such legislation. In any event, we are not here concerned with the crime of one tribe member against another, a field in which the tribe had jurisdiction, but with a crime committed by a tribe member against a white person. No case has been cited, and I believe none can be found, which holds that under existing legislation the Klamath tribe would have a right to try an Indian under such circumstances, to the exclusion of the federal courts. Congress had power and authority to pass such legislation.

In re Petition of Carmen, D.C.N.D.Cal. 1958, 165 F.Supp. 942, is not in point. The Court was discussing a crime committed prior to the effective date of

Public Law 280. Likewise, the Washington cases, State v. Paul, 53 Wash.2d 789, 337 P.2d 33; Wesley.v. Schneckloth, Wash., 346 P.2d 658; Application of Monroe, Wash., 346 P.2d 667, and other cases are not in point. When the state of Washington was admitted to the Union, its constitution provided that Indian lands should remain under the absolute jurisdiction and control of Congress. Public Law 280 set up a specific procedure for states with such reservation. See § 6.

Williams v. Lee, 1958, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251, relied on by petitioner, does not support his theory. Justice Black, in his opinion, recognizes residual jurisdiction in the state over certain crimes committed on Indian Reservations. Furthermore, the opinion in that case was concerned with the constitution of the state of Arizona and with special federal laws and treaties dealing only with the Navajo nation or tribe of Indians. The Arizona constitution contained an express disclaimer of jurisdiction over Indian lands (36 Stat. 569, § 20). The Navajo tribe has always had a system of criminal and civil courts and, at the time of the decision, was exercising a broad criminal and civil jurisdiction over outsiders against Indian defendants. The opinion recognizes Public Law 280, but calls attention to the fact that such law would require the people of the state to affirmatively accept the responsibility of enforcing such law. Arizona was not one of the states to which Congress granted outright jurisdiction, such as it granted to Oregon and other states.

Judge Solomon's opinion in Klamath & Modoc Tribes, etc., v. Maison, D.C.D. Or.1956, 139 F.Supp. 634, is not in conflict with my conclusions. The findings in that case dealt with the Indian treaty of October 14, 1864 (16 Stat. 707) between the United States and the tribes therein mentioned. The treaty reserved to the tribes certain hunting and fishing rights on the Klamath Reservation. Judge Solomon held that the tribes had the exclusive right, privilege and immunity to hunt and trap upon said Reservation without restriction or control, except such as they might impose upon themselves. He pointed out that Public Law 280 did not attempt to extend the hunting and trapping laws of the state of Oregon to the Klamath Indian Reservation. As a matter of fact, said Law expressly exempts such hunting and trapping rights.

On February 15, 1929 (45 Stat. 1185, 25 U.S.C.A. § 231) Congress surrendered to the states all jurisdiction over Indians and Indian Reservations in the field of health and education and gave the states, through the Secretary of the Interior, complete jurisdiction in connection with enforcing sanitation and quarantine regulations and compulsory school attendance in such field.

On July 2, 1948 (62 Stat. 1224, 25 U.S.C.A. § 232) Congress surrendered to the state of New York complete jurisdiction over all crimes committed on Indian Reservations within the state of New York, reserving only to the Indians the hunting and fishing rights as guaranteed to them by any agreement, treaty or custom.

On September 13, 1950 (64 Stat. 845, 25 U.S.C.A. § 233) Congress surrendered to the state of New York complete jurisdiction in civil actions between Indians and other persons with certain exceptions which it is not necessary to mention. Clearly, Congress has been working toward the total emancipation of all Indians. When emancipation is to be granted is a matter for Congress to determine. United States v. Nice, 241 U.S. 591, 598, 36 S.Ct. 696, 60 L.Ed. 1192.

1(b). Public Law 280, the validity of which I have just upheld, was passed on August 15, 1953. The Klamath Indian Termination Act was passed by Congress on August 13, 1954. If jurisdiction passed to the states, as I have held, then such jurisdiction was in the state of Oregon at the time of the passage of the Termination Act of 1954.

It is the position of the petitioner that Congress, by passage of said Klamath

Termination Act, directed that the tribe should retain jurisdiction over all of its affairs, including the persons of the Indians, until the dissolution was complete and that such Act would in substance repeal or modify Public Law 280 to that extent.

A statute expressly defining the jurisdiction of a court will not be controlled by implication arising from the enactment of subsequent statutes. Rosencrans v. United States, 165 U.S. 257, 17 S.Ct. 302, 41 L.Ed. 708; Acts of Congress in pari materia are to be construed with reference to each other. Greenleaf v. Goodrich, 101 U.S. 278, 25 L.Ed. 845. All statutes relating to the same subject matter must be construed together and in such case both will be given effect, if possible. United States v. Babbit, 1 Black 55, 66 U.S. 55, 17 L.Ed. 94; In re Henderson's Tobacco, 11 Wall. 652, 78 U.S. 652, 20 L.Ed. 235. New enactments of a fragmentary nature on a subject covered by previous general legislation should be fitted into the existing system and given effect in conformity thereto. United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859. Congress is presumed to know its own laws and a later general statute does not overrule an earlier specific statute unless it does so clearly. United States v. Hawkins, 9 Cir., 1955, 228 F.2d 517. Repeals by implication are never favored and before the repeal of a statute will be implied, there must be an irreconcilable conflict between such statutes. United States v. Taylor, 104 U.S. 216, 26 L.Ed. 721; United States v. Scott, 3 Wall. 642, 70 U.S. 642, 18 L.Ed. 218; Davis v. Hutchinson, 9 Cir., 1929, 36 F.2d 309.

Applying the foregoing rules of construction to the statutes in question, I find there is no conflict between Public Law 280 and said Klamath Termination Act. Public Law 280 can be given full force and effect without in any way invading the rights and privileges mentioned under the Klamath Termination Act.

2. Petitioner contends that this law does not per se return jurisdiction in the Oregon courts over the crime in question.

The title to Public Law 280 reads:

"To confer jurisdiction on the States of California, Minnesota, Nebraska, Oregon, and Wisconsin, with respect to criminal offenses and civil causes of action committed or arising on Indian Reservations within such states, and for other purposes."

Section 2(a) of the Act names the states of California, Minnesota, Nebraska, Oregon and Wisconsin as the states to whom immediate jurisdiction is granted.

Subdivision (b) contains a proviso with reference to the protection of hunting, trapping and fishing rights and others.

Section 4(a) gives to the same states jurisdiction over civil causes of action arising between Indians or to which Indians are parties, even though the causes may arise in Indian country.

Section 6 of the Act recognizes those states which were admitted to the Union under a constitutional provision which reserved all jurisdiction over the Indians and Indian country to the United States. This section makes provision whereby those states may remove any legal impediment to the assumption of criminal and civil jurisdiction in accordance with the provisions of the Act and further provides that the provisions of the Act shall not become effective as to such assumption of jurisdiction by any state until the people thereof have amended their constitution or statutes, as the case might be.

Section 7 of the Act gives the consent of the United States to *any other* state not having jurisdiction with respect to criminal offenses or civil causes of action.

The history of the Act discloses that separate bills granting such jurisdiction to each of said five states, similar to the bill granting jurisdiction to the state of New York, were pending in Congress

at the time of the adoption of the general act, Public Law 280. Congressional & Administrative News, 83rd Cong., 1st Sess., 1953, Vol. 2, p. 2413. Such history indicates that the state and local authorities in each of those states (California, Minnesota, Nebraska, Nevada, Oregon and Wisconsin) had indicated agreement to the proposed return of jurisdiction, with the exception of Nevada. The authorities in Nevada were not agreeable to acceptance of such jurisdiction without the aid of a federal subsidy. No doubt, Section 7 of the Act was intended to cover states such as Nevada if and when its legislature would approve the transfer by affirmative action.

There can be little doubt about the intention of Congress to transfer immediate jurisdiction of Indians and Indian country to the state of Oregon, except as to the Warm Springs Reservation. The consent required in Section 7 was never intended to apply to the states named in Section 2(a), now 18 U.S.C.A. § 1162. It is obvious from the title of the act that immediate jurisdiction was to be transferred to the state of Oregon and the other states specifically mentioned.

▪ The express mention of states with constitutional impediments in Section 6 would automatically exclude a state, such as Oregon, without such an impediment. Likewise, the consent required in Section 7 extends only to "any other state not having jurisdiction." This would automatically exclude states which were given jurisdiction, such as Oregon, under Section 2(a). The expression of one thing in a statute is to the exclusion of another under the maxim inclusio unius est exclusio alterius. United States v. Arredondo, 6 Pet. 691, 31 U.S. 691, 8 L.Ed. 547; Arthur v. Cumming, 91 U.S. 362, 23 L.Ed. 328; Paso Robles Mercantile Co. v. Commissioner, 9 Cir., 1929, 33 F.2d 653, certiorari denied Paso Robles Mercantile Co. v. Lucas, 280 U.S. 595, 50 S.Ct. 40, 74 L.Ed. 642.

The word "jurisdiction" as used in Section 2(a) has a well-understood judicial meaning and is presumed to be used in that sense. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Westerlund v. Black Bear Mining Co., 8 Cir., 1913, 203 F. 599; N.L.R.B. v. Coca-Cola Bottling Co., 350 U.S. 264, 76 S.Ct. 383, 100 L.Ed. 285.

▪ If we apply the foregoing rules of construction to Public Law 280, it is conclusive that Congress intended to give immediate jurisdiction to the states specifically named under Section 2(a); otherwise, there would be no reason for specifically postponing the passing of jurisdiction to the states covered by Sections 6 and 7. The fact that certain conditions precedent must be fulfilled before the passing of jurisdiction to the states mentioned in Sections 6 and 7 demonstrates beyond question the intention of Congress to pass immediate jurisdiction to those states specifically named.

▪ By this legislation Congress withdrew from the federal courts jurisdiction over crimes affecting Indians or Indian Reservations in the states specifically mentioned. No acceptance was required of those particular states. The state of Oregon had residual jurisdiction over the crime of which the petitioner has been convicted, and full jurisdiction over such crime was returned to the state on passage of Public Law 280.

▪ Petitioner argues that a literal interpretation of the legislation would indicate an intention on the part of Congress to "confer jurisdiction" on the indicated states. I would agree that Congress might have no authority to actually *confer* jurisdiction on an Oregon court, if we accept the meaning of "confer" as creating new jurisdiction in such court. The Congress is presumed to know the law. United States v. Hawkins, supra. It is the duty of the courts to give coherence to what Congress has done within the bounds imposed by a fair reading of the legislation. Achilli v. United States, 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918. Ofttimes when the words of a statute are thoroughly analyzed, a word is found which might destroy the legislation. Then the guide is to be

found in the *purpose* of the statute itself. If a word, construed to give effect to that purpose, leads to absurd, Haggar Company v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340, or even unreasonable, United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345, results, the word must bow to the statutory purpose. When using the word "confer" the Congress intended nothing more than to divest the United States of the jurisdiction which it obtained from the states.

The petition for the issuance of a writ of habeas corpus be and the same is hereby denied.

It is so ordered.

### Appendix

#### A.

United States of America

District Court of the United States of America, for the District of Oregon, County of Clackamas, SS:

At a District Court of the United States of America for the District of Oregon, begun and holden at Oregon City in said County, within and for said District, on the thirteenth day of May in the year of our Lord one thousand eight hundred and fifty.

The Jurors of the United States, within and for said District, on their oath present:

That on the twenty ninth day of November in the year of our Lord one thousand eight hundred and forty seven, at Wai-il-at-pu, in said county, the said place being then and there in the Indian country, certain Indians named Telakite, Tomahas, otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin, with certain other Indians, whose names are to the Jurors unknown, with force and arms in and upon one Marcus Whitman, the said Whitman not then and there being an Indian, did make an assault, and that the said Telakite, Tomahas, otherwise called the murderer, Clokomas, Isiaasheluckas, and Kiamasumkin with other Indians whose names are unknown, certain guns, muskets and pistols, each of the same then and there being loaded and charged with gunpowder and bullets, which guns, muskets and pistols they the said Indians in their hands then and there had and held, to, against and upon the said Marcus Whitman, then and there feloniously, wilfully and of their malice aforethought did shoot and discharge, and that the said Indians, with the leaden bullets aforesaid, out of the muskets, guns and pistols aforesaid, then and there, by force of the gunpowder, shot and sent forth as aforesaid, the said Marcus Whitman, in and upon the body of him the said Marcus Whitman, then and there feloniously, wilfully and of their malice aforethought, did strike, penetrate and wound, giving to the said Marcus Whitman, then and there with the leaden bullets aforesaid, so as aforesaid shot, discharged, and sent forth out of the muskets, guns and pistols aforesaid, by the said Indians, in and upon the body of the said Marcus Whitman, several mortal wounds, of which said mortal wounds, he the said Marcus Whitman, then and there died. And so the Jurors aforesaid, upon their oath aforesaid, do say that the said Telakite, Tomahas, otherwise called the murderer, Clokomas, Isiaasheluckas, and Kiamasumkin, with certain other Indians, whose names to the jurors aforesaid are unknown, him the said Marcus Whitman, in manner and form aforesaid, then and there feloniously, wilfully and of their malice aforethought did kill and murder, and did then and there commit the crime of wilful murder upon the body of the said Marcus Whitman, against the peace and dignity of the said United States and contrary to the form of the Statutes in such case made and provided. And the Jurors aforesaid, upon their oath aforesaid, do further present, that certain Indians named Telakite, Tomahas. otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin, with certain other Indians whose names are to the Jurors unknown, on the twenty ninth day of November in the year of our Lord. one thousand Eight hundred and forty seven,

at Wai-il-at-pu, in the county and district aforesaid, the said place being then and there in the Indian country, with force and arms, in and upon one Marcus Whitman, the said Whitman not being then and there an Indian, feloniously, wilfully and of their malice aforethought, did make an assault, and that the said Indians, with certain tomahawks, axes and knives, which they then and there in their hands had and held, him the said Marcus Whitman, in and upon the head and neck of him the said Marcus Whitman, then and there feloniously, wilfully and of their malice aforethought, did strike, cut, stab and thrust, giving to the said Marcus Whitman, with the weapons aforesaid, then and there in and upon his head and neck several mortal wounds, of which said mortal wounds, he the said Marcus Whitman then and there died. And so the Jurors aforesaid upon their oath aforesaid do say that the said Telakite, Tomahas, otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin, with certain other Indians whose names are to the Jurors unknown, him the said Marcus Whitman, in the manner and form aforesaid then and there feloniously, wilfully and of their malice aforethought did kill and murder, and did then and there commit the crime of wilful murder, upon the body of the said Marcus Whitman, against the peace and dignity of the said United States, and contrary to the form of the Statute in such case made and provided. And the Jurors aforesaid, upon their oath aforesaid do further present, that the said Telakite, Tomahas, otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin with certain other Indians whose names are to the said jurors unknown, at Wai-il-at-pu aforesaid in the county aforesaid, the said county being then and there in the Indian country, on the twenty ninth day of November in the year of our Lord one thousand Eight hundred and forty seven, in and upon the said Marcus Whitman, he not then and there being an Indian, feloniously, wilfully and of their malice aforethought, did make an assault; and him the said Marcus Whitman in some way and manner, and by some means, instruments and weapons, to the jurors aforesaid unknown did then and there feloniously, wilfully and of their malice aforethought deprive of life, so that he the said Marcus Whitman then and there died. And so the Jurors aforesaid, upon their oath aforesaid, do say that the said Indians, him the said Marcus Whitman, in the manner and by the means aforesaid to the said jurors unknown, then and there feloniously, wilfully and of their malice aforethought did kill and murder, and did then and there commit the crime of wilful murder in and upon the body of said Marcus Whitman, against the peace and dignity of the United States aforesaid, and contrary to the form of the Statute in such case made and provided.

A true bill,

F. W. Pettygrove, Foreman

Amory Holbrook U. S. Attorney for the District of Oregon

## B.

| The United States of America v. Teloquoit Tamahas Clokomas Isiaasheluckas Kiamasumkin | District Court of the United States of America, for the District of Oregon, County of Clackamas |
|---|---|

And the said Teloquoit, Tamahas, otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin in their own proper persons cometh into court and having heard the Indictment read, saith that the said District Court of America, here ought not to take further cognizance of the felony in the several counts of the Indictment above specified because protesting that they are not guilty of the felony charged in said Indictment aforesaid, nevertheless the defendant Teloquoit, Tamahas, otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin sayeth that at the time of the alleged commission of the so called

felony, if committed, to wit, on the twenty ninth day of November, One Thousand Eight Hundred and forty seven, they were native born Indians belonging to the Cayuse Nation, whose territory lyeth west of the Summit of the Stoney or Rocky Mountains, and without the limits of the Indian Country as defined by the Congress of the United States in legislative enactments previous to the time of the alleged commission of the so called felony, if committed, and therefore not under or in anywise subject to the jurisdiction of the Courts of the United States.

And the Defendants Teloquoit, Tamahas, otherwise called the murderer, Clokomas, Isiaasheluckas and Kiamasumkin further sayeth that, Wai-el-at-pu the place where the alleged felony is supposed to have been committed, was part and parcel of the country known as, claimed and possessed by the said Cayuse Nation, aforesaid, and without the jurisdiction and laws of the United States, at the time aforesaid, and subject to the laws and usages of the said Cayuse Nation of Indians they being free and independent, and of this they are ready to verify. Wherefore, the Defendants aforesaid, say, that this Court hath no jurisdiction to cause the defendants aforesaid to make a further or other answer to said Bill of indictment, for said supposed crime alleged in the bill of indictment. And the defendants aforesaid pray judgment whether they shall be held bound to further answer said indictment.

| | | | |
|---|---|---|---|
| Teloquoit | his | X | mark |
| Tamahas | his | X | mark |
| Clokomas | his | X | mark |
| Isiaasheluckas | his | X | mark |
| Kiamasumkin | his | X | mark |

C.

| | |
|---|---|
| United States | |
| vs. | Oregon City |
| Telakite | May 24, A.D. |
| Tomahas, or murderer | 1850 |
| Clokamus | |
| Isiaasheluckas | |
| Kiamasumkin | |

We as Pettit Jurors in the above case find the Defendants Telakite, Tomahas, otherwise called the murderer, Clokamus, Isiaasheluckas and Kiamasumkin, guilty of the charge as set forth in the indictment.

Hiram Straight—Foreman
Joseph Parrot
J. T. Hunsaker
William A. Cason
Andrew Jackson
Albion Fort
Samuel Welch
Joseph Olfrey
John Dinsmore
Anson Cone
John Ellenburgh
A. B. Holcomb

(Filing Information on Reverse Side)

Verdict

U. S.

vs.

Telakite
Tomahas, the murderer
Clokomas
Isiaasheluckas
Kiamasumkin

Filed this 23rd day of May A. D. 1850

G. L. Curry, Clk

By F. S. Holland, Dpty